GLIDDEN & JOY VARNISH CO. OF OHIO v. INTERSTATE NAT. BANK OF KANSAS CITY.

(Circuit Court of Appeals, Eighth Circuit. September 2, 1895.)

No. 529.

1. PRINCIPAL AND AGENT—AUTHORITY TO SIGN NOTES.

The G. Co., a manufacturing and trading corporation located in Ohio, had a branch in Missouri, which was conducted by one D., as general agent and manager, and at which a large business was carried on, in the purchase and working up of raw material, and the sale of the finished product over a large territory. D was left in full control of all departments of this business conducted in Missouri, and managed all its affairs, financial and other, with the knowledge and consent of the officers of the G. Co., and generally without directions or oversight by them. He reported to the G. Co. from time to time, and some of his reports showed entries of "bills payable." Upon the trial of an action against the G. Co. upon notes signed in its name by D., as treasurer, the president of the G. Co. testified that he knew that D. was signing all the bills payable made by the Missouri concern for goods purchased; that he supposed it was the natural order of things for D. to procure the discount of bills receivable by indorsing them as treasurer of the G. Co.; and that, if money were required in an emergency, he supposed D. would be expected to make and procure the discount of the company's notes. *Held*, that D., being left in the absolute control and management of the whole business of the G. Co. in Missouri, to act on his discretion, had authority to do whatever a reasonably prudent merchant or manufacturer would do, and, accordingly, to sign promissory notes in the name of the G. Co. Per Caldwell and Thayer, Circuit Judges. Sanborn, Circuit Judge, dissenting.

2. SAME.

*Held*, that the course of the business, the reports of D. showing notes made by him, and the testimony of the president of the G. Co. were sufficient evidence to authorize a finding that D. was impliedly authorized to sign notes, though, merely as general manager of the business, he would not have such authority. Per Sanborn, Circuit Judge.

In Error to the Circuit Court of the United States for the Western District of Missouri.

This suit was brought by the Interstate National Bank of Kansas City, Kan., the defendant in error, against the Glidden & Joy Varnish Company, the plaintiff in error, an Ohio corporation, on four promissory notes (one dated May 6, 1893, for $3,000; one dated May 29, 1893, for $2,000; one dated June 16, 1893, for $2,000; and one dated July 1, 1893, for $3,000), each due 90 days after date, and signed, "The Glidden & Joy Varnish Company, Geo. E. Dudley, Treas." These notes are renewals of notes originally given in January, February, March, and December, 1891. The defendant pleaded non est factum. This was the single issue to be tried, and it turned on the question whether George E. Dudley had authority to execute the notes in the defendant's name. There were two corporations,—one, the Glidden & Joy Varnish Company, a corporation of the state of Ohio, and the defendant in this action; and the other, the Glidden & Joy Varnish Company of Kansas City, Mo. The case hinges on the relation these companies bore to the business out of which the indebtedness arose, and on the relation George E. Dudley sustained to each of these companies, and particularly to the defendant company, at the time the notes in suit were executed.

The plaintiff in error, the Glidden & Joy Varnish Company, was organized in Ohio, March 27, 1883, with a capital stock of $100,000, which was afterwards increased to $200,000, and was held chiefly by the following persons, in about the amounts named, namely: Francis H. Glidden, $70,000; F. K. Glidden,

$50,000; C. A. Grasselli, $30,000; F. A. Glidden, $16,000; O. M. Stafford, $12,500; W. J. Glidden, $2,600; Emily Meaher, $7,000; Mary A. McKay, $5,000; and the rest was held by various persons, in small amounts. The officers of the Ohio company were F. H. Glidden, president; F. A. Glidden, vice president; F. K. Glidden, secretary and treasurer; W. J. Glidden, assistant superintendent; and George E. Dudley was a stockholder, and a member of the board of directors and of the executive committee. The Glidden & Joy Varnish Company of Kansas City, Mo., was organized in Missouri, August 10, 1887, with a capital stock of $20,000, and its officers were F. K. Glidden, president; William F. Joy (a brother-in-law of F. H. Glidden), vice president; George E. Dudley, secretary and treasurer. Both corporations were organized to conduct the same kind of business. The Ohio company established in Kansas City a branch of its business in 1885, and put George E. Dudley in charge of it, as general agent and manager. He conducted the business at that point and in that capacity until the formation of the Missouri company, in August, 1887, at which time he became a stockholder and director of that company, and its secretary and treasurer, and was made sole agent and manager, for the purpose of conducting its business. The object of incorporating the Missouri company is not very clear. Its stockholders and officers were substantially the same as those of the Ohio company, and it carried on the same business that Dudley had previously carried on as agent and manager of the Ohio company in Kansas City, and conducted it in the same manner. Whatever may have been the object of the Ohio company, or—what is the same—of its stockholders, in organizing the Missouri company, it was afterwards practically, though not technically, dissolved; and the Ohio company acquired all its property, and succeeded to its business, which was thereafter conducted by Dudley, as agent and manager of the Kansas City branch of the Ohio company's business, precisely as it had been before the organization of the Missouri company. These facts appear from the records of the two companies, the correspondence of the Ohio company, and the other testimony in the case.

On January 27, 1891, at a meeting of the stockholders of the Ohio company, this resolution was unanimously adopted:

"The question of purchasing the property of, and absorbing, the Glidden & Joy Varnish Company of Kansas City, was taken up; and after due consideration the following resolution (as stockholders' action) was offered by C. A. Grasselli, and seconded by O. M. Stafford: 'Resolved, that the Glidden & Joy Varnish Company of Cleveland, Ohio, will purchase the property of the Glidden & Joy Varnish Company of Kansas City, Missouri (as shown by balance sheet and record book of Jan. 27, 1891), upon the following terms, viz.: All the capital stock of the Glidden & Joy Varnish Company of Kansas City, Missouri, shall be surrendered and canceled, except one share to each director of that company, the which three shares shall be by each of them transferred to the Glidden & Joy Varnish Company of Cleveland, Ohio, to be held in trust to keep alive the charter of said Glidden & Joy Varnish Company of Kansas City, Missouri. The Glidden & Joy Varnish Company of Cleveland, Ohio, shall then issue to each stockholder of said Glidden & Joy Varnish Company of Kansas City, Missouri, certificates of stock of said Glidden & Joy Varnish Company of Cleveland, Ohio, to the same amount as he shall have so surrendered stock in said Glidden & Joy Varnish Company of Kansas City, Missouri.' "

The directors of the Ohio company on the same day ratified this resolution, in these words:

"The resolution was adopted by the stockholders at their meeting this day recorded, pertaining to purchase of property of Glidden & Joy Varnish Company of Kansas City, having been unanimously indorsed at said stockholders' meeting. It was moved by F. K. Glidden, and seconded by O. M. Stafford, that the directors hereby recognize, ratify. and approve such stockholders' action, and that same be spread upon the records of this company. Unanimously carried.                                           F. H. Glidden, Pres't.
                                                                           "F. K. Glidden, Sec'y."

On the same day the stockholders of the Missouri company unanimously passed the following resolution to sell all the property of the Missouri company to the Ohio company:

"Resolution offered by F. H. Glidden, and seconded by F. K. Glidden: 'Resolved, that this company [the Glidden & Joy Varnish Company of Kansas City, Missouri] will sell, and does hereby sell, all its property to the Glidden & Joy Varnish Company of Cleveland, Ohio, upon the following terms: All the capital stock in this company to be surrendered and canceled, except one share to each director, which three shares shall be transferred to the Glidden & Joy Varnish Company of Cleveland, Ohio, to be held in trust to keep alive the charter of the Glidden & Joy Varnish Company of Kansas City, Missouri. The Glidden & Joy Varnish Company of Cleveland, Ohio, shall thereupon issue to each stockholder of the Glidden & Joy Varnish Company of Kansas City stock in the Glidden & Joy Varnish Company of Cleveland, Ohio, to the same amount as he shall have so surrendered in the Glidden & Joy Varnish Company of Kansas City, Missouri. The Glidden & Joy Varnish Company of Kansas City, Missouri, hereby accepts the propositions of the Glidden & Joy Varnish Company of Cleveland, Ohio.' "

In pursuance of this action of the companies, respectively, all the stock of the Missouri company, except 3 shares, aggregating $300, was canceled and destroyed, and stock in the Ohio company issued therefor to the holders thereof. In this way, Dudley became the owner of 50 shares of stock in the Ohio company. This purchase and transfer of the property of the Missouri corporation to the Ohio corporation was to be treated as made on January 1, 1891, and was actually so treated by both companies, though the date of the consummation of the transaction, as disclosed by the records, was in fact January 27, 1891. All the property of the Missouri company passed to and vested in the Ohio company; being entered on the books of the latter company as its own property, and thereafter carried thereon as its assets. Prior to this sale the books of the Missouri company were kept at Kansas City, where its office and place of business was fixed by its articles of incorporation; but, after the sale of its property and business to the Ohio company, its books were taken to Cleveland, Ohio, and after that time there were no more meetings of the stockholders or directors of the Missouri company.

At a meeting of the directors of the Ohio company on the 27th day of January, 1891, the following proceedings took place:

"Minutes of directors' meeting of the Glidden & Joy Varnish Company of Cleveland, Ohio, held at the office of the company on the twenty-seventh day of January, 1891, immediately after the adjournment of the stockholders' meeting [this was the stockholders' meeting at which the property of the Missouri company was purchased]: There were present F. H. Glidden, C. A. Grasselli, O. M. Stafford, F. K. Glidden, F. A. Glidden, G. E. Dudley, all of whom have duly qualified as such directors since the foregoing stockholders' meeting. Moved and seconded that F. H. Glidden be chairman of the directors' meeting, and F. K. Glidden secretary of same. Carried. There being present a quorum for the transaction of business, it was unanimously decided to proceed with the election of officers for 1891. It was moved by C. A. Grasselli, and seconded by O. M. Stafford, that the officers of this company as of 1890 be re-elected for the year 1891. Unanimously carried. * * * It was also moved and seconded that the executive committee of 1890 be re-elected for the year 1891, and that Geo. E. Dudley be added to the same. Same was carried. * * * Moved by F. A. Glidden, and seconded by C. A. Grasselli, that the salary of George E. Dudley, as manager of the Kansas City, Missouri, branch, be fixed at $2,000 for the year 1891."

At a directors' meeting held July 7, 1891, the following, among other, proceedings were had:

"It was further moved and seconded that the matter of taxation of corporations in Missouri, as mentioned in Geo. E. Dudley's letter of July 1, 1891, as pertaining to the Kansas City department, be referred to the executive committee of this [Cleveland] company, for the purpose of taking legal advice on the subject. Same was carried.　　　　　F. H. Glidden, Pres't.

"F. K. Glidden, Sec'y."

"At a directors' meeting held January 26, 1892, at which F. H. Glidden, F. K. Glidden, W. J. Glidden, George E. Dudley, C. A. Grasselli, and O. M. Stafford, by his proxy, F. K. Glidden, were present, the following, among other, proceedings were had: Moved by C. A. Grasselli that salary of Geo. E. Dudley, as manager of Kansas City branch, be fixed at $2,500 for the year 1892. Carried.                    F. H. Glidden, President.
                                        "F. K. Glidden, Sec'y.
                                        "W. J. Glidden, Act'g Sec'y."

Numerous letters were put in evidence, from which it appears that, when Western customers applied to the Ohio company, they were invariably referred to "our Kansas City office," "our Kansas City department," or "our Kansas City branch." The following is a sample of one of these letters:

"The Glidden & Joy Varnish Company. Cable Address, Copal, Cleveland. Branches: Baltimore, Boston, Chicago, Kansas City, New Orleans, St. Louis, New York.

                                        "Cleveland, O., Mar. 10, 1893.

"J. J. Wiley, Foreman Painter, International & Great Northern R. R. Co., Palestine, Texas—Dear Sir: We are in receipt of your favor without date, requesting sample of our Surfacene. We have referred your letter to our Kansas City office, from which point the matter will have attention. * * *
    "Yours, truly,                    The Glidden & Joy Varnish Co.,
                                        "F. K. Glidden, Sec'y."

It will be observed that, in the enumeration of its branches on its letter heads, the defendant names Kansas City as one of them.

After the absorption of the Missouri company by the Ohio company, Dudley, as manager of the Kansas City branch, made reports of the business he was conducting for that branch to the Ohio company, from time to time, which reports showed, among the liabilities of the Kansas City branch, "bills payable." Dudley had complete charge of the funds of the company at Kansas City. He made all purchases and sales, received and paid out all moneys, discounted notes, and performed all the functions of local treasurer of the Ohio company for the Kansas City branch. He was in fact the local treasurer of the Ohio company at Kansas City. He acted as such, and signed his name as such. The following are excerpts from the testimony of F. H. Glidden, president of the Ohio company: "Q. Who stayed out here, up to January 27, 1891, running the Missouri business? A. Mr. Dudley did. Q. Who had charge of the bank accounts at Kansas City? A. Mr. Dudley. Q. Who drew all the checks that were drawn? A. Mr. Dudley. Q. Who signed all the bills that were payable by the concern out here, in Missouri? A. Mr. Dudley. Q. Did you know he was signing them? A. Yes, sir. * * * Q. Who was there here, at Kansas City, to sign the paper for the company, if a paper was necessary to be signed? A. George E. Dudley. Q. None of the officers back there in Cleveland pretended to ever sign a paper, did you, during that time, for the Kansas City concern? A. I think not. * * * Q. Now, then, after this transfer in January, 1891, how did you do the business,—the same way? A. After 1891? Q. After January, 1891, when you made this transfer? A. We conducted the business the same way, up to the assignment. Q. It was just run along in the same way? A. Yes, sir. Q. Dudley was left out here again, with full swing? A. Yes, sir. Q. If there was anything about the Kansas City branch that needed signing, who was the man that signed it? A. Mr. Dudley. * * * Q. After January, 1891, so far as any dealings with the Kansas City concern is concerned, Dudley was doing it just as he was doing it before? A. So far as I know, he was. * * * Q. Now, then, when the statement of February, 1892, came, there was on that the words, 'Bills payable, $2,020.50'? A. Yes, sir. Q. That showed that the Glidden & Joy Varnish Company, the Kansas City concern,—however we may differ about whether it is a Missouri or a Cleveland company,—the Kansas City concern owed that much in notes? A. Yes, sir. Q. Who was there to make these notes? A. They were made by Geo. E. Dudley. Q. There wasn't anybody else to make them? A. Nobody else to make them. He had the management. Q. When you got that account

sent on to you, with that information, that was notice to you that Dudley had made that amount of notes? Now, here is a statement of July 1, 1892, 'Bills payable, $3,519.25.' A. I see it. Q. That showed that the Kansas City concern, out here, owed that much money in notes? A. Yes, sir. Q. There was nobody to make those notes, except George E. Dudley? A. No, sir. Q. Here is, 'August, 1892, bills payable, $1,219.29'? A. Yes, sir. Q. The same observation applies to that? A. Yes; it also shows there is $5,000 cash. * * * Q. Of necessity, a concern of this kind, doing business in Kansas City, and extending a line of credit to customers, had to have a bank and bank account? A. It did. Q. And the ordinary way to keep a bank account is to have a check book, with stubs to show what checks are drawn? A. Yes, sir. Q. During all this course of years, did your people in Cleveland send out here, to look through those stubs of checks, to see what was becoming of the money drawn from the bank? A. I think my son was out here. Q. You never came? A. I never came for that purpose. I have been here. Q. When you were here, did you ever undertake to do that? A. No, sir; I did not. Q. When you were here, did you ever undertake to examine the bank accounts? A. I did not. * * * Q. You knew they were doing business with some banks? A. I did, of course. * * * Q. I would like you to define to the jury what you think Dudley could do and could not. A. The jury understands very well, and I guess you do, that you cannot conduct a business without having some treasurer or manager of that business; and, if he did any business, it was for the purpose of making money, I suppose, and in order to make money he would have to make those terms that all people do in mercantile business. He would have to sell his goods on credit and time to his customers. He would do the same as he would in Ohio, to get all the bills receivable he could, that we might use them if we had occasion to. That is what he did. When Dudley got those notes, and wanted money, I suppose it was in the natural order of things to take them to the bank, and put the indorsement on as treasurer of the Glidden & Joy Varnish Company, and discount them, and get the proceeds; but to make new notes and get loans from the bank, we never knew he ever got a dollar. Q. I suppose, in your mercantile business, as you said a little while ago, that if you got along to the time you had to pay a coal bill, and didn't have any customers' paper, and needed a little money, you would go to the bank, and have the money advanced? A. We would, at home. Q. Would he, out here? A. I think he would. Q. No one else was here, and Dudley was the man that was expected to do it? A. I think so." There was much other testimony tending to show that, after the purchase of the property of the Missouri company by the Ohio company, the Kansas City business was conducted as a branch of the business of the Ohio company by Dudley, as manager for that company. F. K. Glidden, then secretary of the Ohio company, and who had been president of the Missouri company, came to Kansas City early in August, 1893, and found that Dudley had left the city, and was behind in his accounts. While he was in Kansas city, Dudley returned, and with his usual signature, "The Glidden & Joy Varnish Company, Geo. E. Dudley, Treas.," drew a check in Glidden's favor on the bank account in the Interstate Bank. Thereupon, Glidden sued out an attachment in favor of the Ohio company, and against the Missouri company, and seized all the property of the concern in Missouri, which consisted of $12,000 merchandise and $25,000 in accounts. After suing out this attachment, as president of the Missouri company, he made an assignment for the benefit of its creditors to his brother-in-law, James K. Meaher. The assignee took possession of all the property in Missouri, and sold it at assignee's sale, and one of the Gliddens became the purchaser for the sum of $5,000. The jury found the issue for the plaintiff. There was judgment on the verdict, and the defendant sued out this writ of error.

R. E. Ball and J. E. Runcie, for plaintiff in error.

Frank Hagerman and Henry Wollman (Alexander New, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Waiving the technical objections to the sufficiency in form of the exceptions taken at the trial and of the assignments of error in the brief, we will proceed to dispose of the case on its merits.

For some reason, which we are unable to comprehend, objections were taken all through the trial to the introduction of all evidence tending to show that it was the Ohio, and not the Missouri, corporation that was doing business at Kansas City after January, 1891. Objection was also taken to all evidence tending to show that Dudley had authority, as manager of the Ohio company's Kansas City branch, to borrow money and execute negotiable notes therefor. One ground of this objection was that Dudley's authority, as manager, to execute notes for borrowed money, could only be shown by some formal order or resolution of the stockholders or board of directors of the defendant company. A further ground of this objection was the erroneous assumption of fact that the notes sued upon were not executed in the name of the defendant company. This assertion is made all through the brief of the counsel for the plaintiff in error, but it is an error of fact. The charter name of the Missouri company was the "Glidden & Joy Varnish Company of Kansas City, Missouri." The charter name of the Ohio company was the "Glidden & Joy Varnish Company," and the notes sued on are executed in this name.

The alleged error discussed at greatest length, and the one apparently chiefly relied upon, is that the court refused, at the close of all the evidence, to give the jury a peremptory instruction to return a verdict for the defendant. The contention of the plaintiff in error is (1) that it was the Missouri, and not the Ohio, company that was doing business at Kansas City; and (2) that, even if the Ohio company was carrying on the business at Kansas City, its manager, Dudley, had no authority to borrow money and execute negotiable notes therefor, in the name of that company. These questions of fact were properly submitted to the jury, under instructions to which, as a whole, no just exceptions can be taken. Upon a careful reading of all the evidence on these issues, it is obvious that the court below did not err in refusing to instruct the jury to return a verdict for the defendant. There was abundant evidence, we think, which necessitated the submission of the case to the jury. It is indisputable, from the evidence, that after the sale of its property to the Ohio company, and the cancellation of all its stock, except a nominal sum, "to keep alive" its charter, the Missouri company did no business in Kansas City or elsewhere. It had no property, no capital, no credit, and no manager. The business at Kansas City, from and after the date of this transaction, was the business of the Ohio company, and was conducted by Dudley, as its manager. After that time, Dudley was the manager of the Ohio company. That company fixed and paid his salary as manager, and it was to that company that he made his reports and returns. After the sale of its property and the cancellation of its stock, the Missouri company was nothing more

than a dummy.    It had probably a technical legal existence, through the three shares of uncanceled stock held by the Ohio company, not as capital stock for any business purposes, but "in trust to keep alive the charter" of the company.    Its business career was closed.    If not dead, it was in a comatose condition, closely bordering on death. It remained in this condition until 1893.    In that year it was discovered that the Kansas City branch of the Ohio company, owing to the general depression in business then prevailing throughout the country, or to the mismanagement or dishonesty of Dudley, or from some other cause, was so much involved that its assets were probably insufficient to pay its debts.    So long as the business of this branch was prosperous and profitable, the Ohio company received and appropriated the profits, and nothing was heard of the dormant Missouri company; but, when it was discovered that the business of this branch was likely to entail a loss, the Ohio company at once denied that it was a branch of its business, and disclaimed responsibility for its debts.    It set up the claim that it was the Missouri company that had been conducting the business at Kansas City all the time, and that that company alone was responsible for the debts of the concern; and, claiming itself to be a creditor of the Missouri company, it attached all the property in Missouri, as the property of that company.    Immediately following this attachment, F. K. Glidden, then secretary of the Ohio company, and the last president of the Missouri company, but who had performed no official act as president of that company since it sold its property to the Ohio Company, in 1891, appeared in Kansas City, and, assuming that the property there was the property of the Missouri company, proceeded, as president of that company, to make an assignment of the property for the benefit of the creditors of that company, of which the Ohio company was alleged to be one.    It is needless to say that the attachment of its own property, and the assignment of property that did not belong to the assignor, did not strengthen the claim of the plaintiff in error. As we have seen, the Ohio company retained, as trustee, the three shares of uncanceled stock of the Missouri company, "to keep alive the charter" of that company.    For whom the Ohio company was to act as trustee, in respect of these three shares of stock, does not appear, and the nature of the trust is not disclosed, further than that it was "to keep alive the charter."    But it can make no such use of that charter as is here attempted.    It cannot, when it is prosperous, claim the Kansas City business as its own, and, when it is unprofitable, claim that it is the business of the Missouri company.    The law will not countenance any such thimblerigging.    One corporation cannot avoid the payment of its just obligations by putting forward as the debtor another corporation, similar in name, which, if it has a legal existence at all, exists only in name, and as a mere dummy or scapegoat for the debtor corporation.    The Ohio company is now seeking, not only to resuscitate the Missouri company, but to give to that resuscitation a retroactive effect, so that the debts and obligations created by the Ohio company while it carried on the Kansas City business and the Missouri company slept shall be treated as the

debts and obligations of the latter company. One corporation cannot keep another corporation under its management and control, and use it as a scapegoat for its debts whenever it finds it desirable or profitable to do so. The liability of the plaintiff in error for the debts of the Kansas City branch does not arise from the fact that it or its stockholders owned the uncanceled stock of the Missouri company, or, for that matter, all the stock of the Missouri company. Its liability is grounded on the fact that after the sale of its stock and property to the Ohio company the Missouri company went out of business, and that thereafter the Ohio company owned the property, and conducted the business through its manager, Dudley. It is quite immaterial to the decision of this case what was the legal effect of the transaction between the two companies, whereby the Ohio company acquired the property of the Missouri company, and the stock of the latter company, save a nominal amount, was canceled. The question here is not whether that transaction was valid, or whether it disabled the Missouri company from further conducting business; but the question is, did that company in fact continue to conduct and carry on the business at Kansas City after the sale of its property to the defendant and the cancellation of its stock? Upon that question there is no room for contention. It is perfectly clear, upon the evidence, that from the date of that transaction the Ohio company carried on the business at Kansas City, and that it is responsible for the debts contracted by its manager in the control of that business, and that the circuit court should have so told the jury.

The remaining controverted question of fact, namely, whether Dudley, as manager of the Kansas City business for the Ohio company, had authority to borrow money, and execute the negotiable promissory notes of the defendant company therefor, is equally clear, upon the evidence. From the time the defendant company established a branch house in Kansas City, in 1885, down to the time the business was closed out, in 1893, Dudley was the sole manager of that business. His relation, as sole manager and director of the business, was the same, whether the business was carried on for the Ohio company or for the Missouri company. He had all the time the entire and absolute control and management of the business. The officers of the company who resided at Cleveland, Ohio, never exercised any control or supervision over the business, and only visited Kansas City at long intervals. Dudley borrowed money, discounted paper, executed all contracts, hired and discharged all employés, attended to the banking business, and signed all notes and checks. No one was over him. None of the officers of either company, who resided in Cleveland, Ohio, ever paid any attention to the business at Kansas City. A more absolute and exclusive management and control of a business cannot be conceived of than that exercised by Dudley. The business was important and extensive. It involved the purchase and manufacture of raw materials, and the sale of the manufactured product. There were four traveling salesmen, who were employed by Dudley, and received their orders and instructions from and reported to him. These traveling salesmen knew of no other person having authority

in or about the business.    The territory allotted to the Kansas City
branch embraced substantially all the country west of the Mississippi
river to the Pacific coast.    An agent and manager left, as Dudley
was, in the sole and exclusive management, direction, and control of
such an extended manufacturing and commercial business, must nec-
essarily exercise very large powers.    It is conceded that he might buy
and sell on credit, and discount bills receivable to raise funds to pay
debts and purchase goods.    Mr. Glidden, the president of the Ohio
company, says that, when Dudley got notes for goods sold, "I suppose
it was in the natural order of things to take them to the bank, and
put the indorsement on as treasurer of the Glidden & Joy Varnish
Company, and discount them, and get the proceeds."    But it is con-
tended he could not borrow money for any purpose, however pressing
the necessity therefor.    It is conceded that he might lawfully execute
the company's negotiable notes for stock or materials, and make them
payable in bank.    Suppose, upon the maturity of such notes, he had
no funds in hand to meet them, and could not raise funds for that pur-
pose by the discount of bills receivable, or that he had no bills to dis-
count.    Was he bound to let the notes go to protest, although he
could borrow the money from the bank to pay them, for the asking?
Or suppose a favorable opportunity offered to buy stock at advan-
tageous figures for cash.    What would a prudent man, whether owner
or manager, conducting a large mercantile or manufacturing business,
do under like circumstances?    Universal usage among all classes of
business men engaged in manufacturing or commercial pursuits an-
swers the question.    Mr. Glidden himself admits that, in an emer-
gency, Dudley had the right to apply to the bank for cash advances;
and, if he had this right, he had, of course, the right to give a note for
the advance.    Left as he was in the absolute control and management
of this whole business, to act according to his own best judgment and
discretion, Dudley had authority to do whatever a reasonably prudent
merchant or manufacturer would have done under like circumstances
and conditions.    His powers were commensurate with the reasonable
and necessary requirements of the business committed to his sole and
exclusive management.    Among the highest duties imposed upon him
by his position was the duty of upholding and maintaining the credit
of the concern.    The protest of the paper of a manufacturing and
commercial corporation, like that for which Dudley was manager,
would instantly destroy its credit, if it did not throw it into bank-
ruptcy.    Dudley was sole manager of the financial as well as all other
departments of the Kansas City branch.    The contention that the
general agent and manager of a commercial and manufacturing busi-
ness, such as Dudley was conducting, has no power to borrow money,
and execute notes therefor, to avert such disasters, does not deserve
serious consideration.    If such an agent, having it in his power to bor-
row money to maintain the credit of the concern and avert insolvency,
should neglect or refuse to do so, he would be guilty of a gross derelic-
tion of duty to his principal.    A general manager, having the exclu-
sive management and conduct of a manufacturing and commercial
business, and admittedly having the power to purchase stock, contract

debts, and discount notes, may, when there is occasion for so doing, borrow money to pay debts or purchase goods, and give his principal's negotiable note therefor.    The authority of such a manager to borrow money does not have to be shown by an express order or resolution of the stockholders or board of directors of the company.    It may be implied from the general powers of such a manager, and the necessities and usages of the business.    This implication would seem to be well-nigh conclusive, when, as in this case, the manager has the sole and exclusive control and management of a branch house of a mercantile and manufacturing corporation whose domicile is in a distant state, and whose officers never assumed to manage or conduct the business of the branch house, or to place any limitations on the powers of its manager, in any respect.    In Scofield v. Parlin & Orendorff Co., 10 C. C. A. 83, 61 Fed. 807, where the defense was similar to that set up in this case, the court said:

"The rulings of the court to the contrary, and, presumably, the sworn denial of the execution of the contract, proceeded upon the theory that, in order to bind the corporation, a contract must be shown to have been executed or authorized by a formal corporate act, such as an order or resolution of a board of directors.    But the business of modern mercantile and manufacturing corporations is not always, or even generally, conducted in that way, but is committed to agents and managers, whose powers are limited, practically, only to the lines of business for the prosecution of which the corporations were formed."

And in the case of Merchants' Nat. Bank of Gardiner v. Citizens' Gaslight Co., 159 Mass. 505, 34 N. E. 1083, the court said:

"Upon consideration of the decisions cited, we think it fair to say that the making and indorsing of negotiable paper is to be presumed to be within the power of the treasurer of a manufacturing and trading corporation, whenever, from the nature of its ordinary business, as usually conducted, the corporation is naturally to be expected to use its credit in carrying on commercial transactions.    Such paper is the usual and ordinary instrument of utilizing credit in commercial dealings, and it is for the interest of the corporation and of the community that the best instrument should be employed.    It is no less for the interest of all that, if negotiable paper is to be employed, its validity should not be open to objections which would impair its usefulness by requiring at every step an inquiry into the authority by which it is issued.    * * *    Although such companies [gas companies] manufacture only as they deliver, and so have no occasion to hold large quantities of manufactured goods for a market, there are features of their business which make it necessary for them to have control of large amounts of money at certain seasons.    Coal—their chief raw material—is uniformly at its lowest price in the summer, and, away from the seaboard, is usually taken in large quantities at that season.    Gas is uniformly sold upon time, and the bills collected monthly or quarterly.    The work of extending and repairing street mains, and other work upon the manufacturing plant, can be done to the best advantage during only a portion of the year.    A business so conducted affords abundant scope for the advantageous use of the credit of the corporations engaged in it, and they would naturally be expected to use their credit in the transaction of their ordinary business."

In the case of Moore v. Manufacturing Co., 113 Mo. 106, 20 S. W. 975, the court said:

"The power of an agent or officer of a corporation to bind his principal is governed by the law of agency; and, where an officer has been permitted to manage all the business of a corporation, his authority to bind it will be implied from the apparent power thus conferred upon him."

And see Mahoney Min. Co. v. Anglo-California Bank, 104 U. S. 192; Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428; Manufacturing Co. v. Soxman, 138 U. S. 431, 11 Sup. Ct. 360; Bell v. Bank, 57 Fed. 821; Washington Sav. Bank v. Butchers' & Drovers' Bank, 107 Mo. 144, 17 S. W. 644; Bank v. Armstrong, 8 C. C. A. 155, 59 Fed. 372; Merchants' Nat. Bank of Boston v. State Nat. Bank of Boston, 10 Wall. 604.

We have carefully examined each error assigned, and are satisfied none of them has any merit, in the light of the facts of the case. The judgment of the circuit court is therefore affirmed, with costs, and with interest thereon from the date of its rendition by the circuit court at the rate of 10 per cent. per annum.

SANBORN, Circuit Judge (concurring). I concur in the result in this case on the ground that the course of business at Kansas City shown in this record, the reports made by Dudley to the plaintiff in error of the existence of bills payable he had made as its agent, and the testimony of its president that, if Dudley needed money to pay a coal bill, he thought he was expected to and would go to the bank, and have the money advanced to pay it, constituted sufficient evidence to warrant a jury in drawing the inference that the corporation knew that Dudley was making promissory notes on its behalf, and impliedly authorized him to do so. But I cannot concur in the view, which I understand to be expressed in the opinion of the court, that the general manager of the business, or of a local branch of the business, of a manufacturing and trading corporation, who is authorized to buy and sell goods, to carry on the manufacturing business, and to take and discount promissory notes for his principal, is thereby vested with the implied power to borrow money on its behalf, and to execute its notes therefor. I do not understand the rule of law to be that such a general agent is presumed to have the same authority to borrow money on and to execute notes in behalf of his principal that a reasonably prudent merchant or manufacturer has to make notes and borrow money for himself. I think the true rule is laid down in section 398 of Mechem on Agency, in these words:

"An agent having general authority to manage his principal's business has, by virtue of his employment, no implied authority to bind his principal by making, accepting, or indorsing negotiable paper."

Tiedeman, in his work on Commercial Paper, at section 77, says that the presumption of law is more strongly opposed to an implied authority to execute and negotiate commercial paper than to do anything else, and that even where there is a general authority "to transact all business," or "to do all lawful acts concerning all the principal's business, of what nature or kind soever," it is very generally held that the power to execute bills and notes is not included.

In New York Iron Mine v. First Nat. Bank, 39 Mich. 644, 651,—a case in which the stock of the mining corporation was held by Samuel J. Tilden and W. L. Wetmore, and the latter had had the entire management and control of the mining business which was carried on by the company in the state of Michigan, had expended more than three million dollars, and had lawfully discounted the bills receivable of the corporation,—the supreme court of Michigan held that all of this

was insufficient to warrant the inference that Wetmore had implied power to borrow money and to issue the promissory notes of the corporation. Judge Cooley, in delivering the opinion of the court, said:

"The issuing of promissory notes is not a power necessarily incident to the conduct of the business of mining, and it is so susceptible of abuse, to the injury, and, indeed, to the utter destruction, of a corporation, that it is wisely left by the law to be conferred, or not, as the prudence of the board of directors may determine."

In my opinion the same rule, and for the same reason, governs the agencies of commercial and trading corporations. McCullough v. Moss, 5 Denio, 567; Murray v. East India Co., 5 Barn. & Ald. 204; Benedict v. Lansing, 5 Denio, 283; The Floyd Acceptances, 7 Wall. 666; Perkins v. Boothby, 71 Me. 91.