## Movius, Receiver, etc., *v.* Lee and others.

*(Circuit Court, N. D. New York.* March 23, 1887.)

1. EQUITY—PLEADING—AMENDMENT—VARIANCE.

A bill brought to charge the directors of an insolvent national bank with the amount of losses caused by the bank's failure, alleged that one of the defendants sold and transferred his stock on a day named, but the evidence showed that defendant had not paid anything for the stock, but delivered it to a messenger of another one of the defendants, from whom he had agreed to purchase it, and that such defendant then sold and indorsed the stock to a third party, as it was agreed he might do if he so desired. Plaintiff moved to amend the bill to conform to the proofs, and make it allege that the transfer was merely formal. *Held* unnecessary.

2. BANKS AND BANKING — NATIONAL BANK—RECEIVERS—SUIT AGAINST DIRECTORS.

A receiver of an insolvent national bank, in his own name or in the name of the bank, may enforce against the directors, for the benefit of the stockholders, depositors, and other creditors of the bank, any right or claim resting upon the non-performance or negligent performance of their duties that the bank itself could have enforced.

3. SAME—RESIGNATION OF DIRECTOR—LIABILITY FOR SUBSEQUENT LOSSES.

A director of a national bank who, before the expiration of his term, sells his stock, and orally resigns his office to the president, in his place of president at the bank, and afterwards receives the money for his stock, prior to the sustaining of losses by the bank, ceases to be a director, and cannot be held liable for subsequent losses caused by the negligence of the directors.

4. SAME—PRESIDENT ABSENT ON SICK-LEAVE.

The president of a national bank, being in failing health, was anxious to resign his position, but, at the suggestion of a majority of the directors, consented to take a year's leave of absence, and during such absence, without any fault on his own part, losses were sustained by the bank, and it became insolvent. *Held,* in a suit by the receiver to charge the directors with such losses, that he was not liable.

5. SAME—LOSS CAUSED BY ACT OF ONE DIRECTOR—NEGLIGENCE OF OTHERS.

The directors of a national bank which has become insolvent by reason of losses caused by the discount, from time to time, of paper not properly secured, indorsed by a director who is a man of wealth, and the largest stockholder in the bank, and in whom the other directors have reason to place confidence, cannot be held liable for the mere failure to discover the illegal transactions, and to prevent such director from continuing therein.

In Equity.

*Ansley Wilcox,* for plaintiff.

*E. C. Sprague,* for defendant Spaulding.

*Benj. H. Williams,* for defendant Johnson.

*David F. Day,* for defendant Cushing.

*Humphrey & Lockwood,* for defendants Coit and Barnes, Ex'rs.

WHEELER, J. The First National Bank of Buffalo was organized December 7, 1863, under the provisions of the national bank act of February 25, 1863, for which the national bank act of June 3, 1864, was substituted, (13 St. at Large, 100,) with a capital stock of $100,000, divided into 1,000 shares of $100 each. At the annual meeting of its shareholders holden January 11, 1881, Charles T. Coit, R. Porter Lee, Thomas W. Cushing, John H. Vought, and George Coit were elected

directors. They took the oath of office required by law, and chose Charles T. Coit president, and R. Porter Lee cashier. George Coit died, and May 20, 1881, the rest of the directors filled the vacancy caused by his death by electing Francis E. Coit a director in his place, who took the required oath of office. Mr. Cushing sold his stock, by bargain made at the bank, to Charles T. Coit, the president, September 24, 1881, at the price of $125 per share, to be paid and transfer to be made afterwards. In consequence of this trade, he then and there, so far as he could by words, resigned his office of director to the president, and never afterwards assumed to be or to act as a director. The health of the president became poor; and at a meeting of the four directors, including himself, remaining after the withdrawal of Cushing, he stated that fact, and that he desired to be relieved somewhat of his official duties, whereupon they voted that he be given leave of absence for such intervals and at such times as he might see proper, for one year from that date, which was October 3, 1881. They then chose the cashier, R. Porter Lee, vice-president, and Theodore W. McKnight assistant cashier. The bank then had an apparent surplus of $50,000, and undivided profits to the amount of $24,277.03, and it is not claimed in this suit but that these items were real. Mr. Charles T. Coit paid Cushing for his stock at the price agreed upon October 7, 1881, and took a transfer of the certificates signed in blank, which was entered on the books of the bank in November, as made September 24, 1881. Charles T. Coit sold most of his stock, 510 shares, to Lee, was absent from the bank on account of his health, and took no part in its management afterwards. He died December 11, 1881. The control and management of the bank was left to Lee, who used its funds in the form of discounts to his associates in business and speculations until great losses were incurred. Prior to the annual election in 1882, he spoke of the vacancies in the board of directors to the defendant Spaulding, and also to the defendant Johnson, and proposed to transfer stock to them, and that each should become a director. Spaulding was president of another national bank, and connected with other corporations, and did not wish to assume new responsibilities, and so told Lee, but consented to the arrangement, and Johnson did likewise. At the meeting January 10, 1882, Spaulding, Johnson, Francis E. Coit, Vought, and Lee were elected directors, who took the oath of office required by law. Lee was chosen president, and McKnight was elected cashier. The control and management of the bank were left to Lee as before. Vought sold his stock to Lee, January 19, 1882, and did not act as director afterwards. Spaulding was engaged with his other business, the family of Johnson was sick, and his son died, and neither of them did anything about the management of the bank. Coit went once, and looked over the loans and discounts. Lee stood well in the community as a man of honor and integrity, as financier and bank manager, and neither of them had any suspicion that the affairs of the bank were not being well and faithfully attended to by him. Lee sent a request to Spaulding, April 11, 1882, for the return of the stock transferred to him, and Spaulding

signed a transfer upon the back of the certificate and returned it, in pursuance of an understanding between them that he would return it on request, and, as he supposed, ended his connection with the bank. The bank had become helplessly insolvent and stopped business April 13, 1882, and was soon afterwards placed in the hands of a receiver. The whole capital surplus, undivided profits, and reserves were gone, and the individual liability of the directors would not pay the depositors. The losses incurred amount in all to more than $600,000. This bill is brought to charge the directors who are living, and the estates of those who are dead, with the amount of these losses.

The bill alleges, in substance, that the defendant Spaulding sold and transferred his stock in the bank on the eleventh day of April, 1882. The evidence shows that he signed the transfer of the stock in blank, and delivered the certificate to the messenger from Lee, without any negotiation with Lee, or any one, at that time, with reference to a sale of the stock. The plaintiff's counsel moved on the hearing to amend the bill to have it allege that the transfer was formal merely, without consideration, and that there was not any sale or valid transfer in effect. It is argued, in support of the amendment, that this would make the bill conform to the proofs merely, and that it should be allowed for that reason. The evidence shows, however, in addition to this, that Spaulding had not paid Lee anything for the stock, and that it was understood between them that Lee might have the stock back for some one else, if he should so desire, at any time. It appears from the whole transaction that, when Lee sent the messenger for the stock, it was in pursuance of that understanding, and that Spaulding acted upon the understanding in complying with the request. There was therefore an agreement for and an actual resale of the stock. The blank in the transfer was filled with the name of a third person to whom Lee had sold the stock, but that was merely a method of carrying out the two sales, and required no negotiation between Spaulding and the other person to make it effectual. The bill now, therefore, alleges the sale as it in fact was, and there is no occasion for the amendment. *Johnston* v. *Laflin*, 103 U. S. 800.

Some question has been made, and discussion had, with reference to the right of the plaintiff to enforce the liability of the defendants, if any exists, for the benefit of stockholders, creditors, or depositors, as the results might, if realized, eventually inure to them, respectively. It seems, however, that the receiver, as the name implies, has in his hands the rights of the bank itself against all and any persons, however the rights may have arisen, to enforce for the benefit of whoever may be entitled to the avails of them; and these rights may be enforced by him in his own name, or in the name of the bank whose corporate existence is continued for that purpose. *Kennedy* v. *Gibson*, 8 Wall. 498; *National Bank of the Metropolis* v. *Kennedy*, 17 Wall. 19; *Case* v. *Terrell*, 11 Wall. 199. If the bank had a right or claim in this respect which it could enforce against the defendants, or any of them, the plaintiff has the same now, which he is entitled to enforce to the same extent; and none appears to have accrued to him which the bank in its own right did not have. The

right rests entirely upon the alleged non-performance or negligent performance of duties as director of the bank. The defendants stand upon different grounds, in some respects, in their defenses to this claim to charge them.

The defendant Cushing sets up in defense, among other things, that he was not a director at all, and therefore owed no duty in that behalf, at the time when the alleged losses took place. Whether he was or not depends upon the effect of what occurred about the sale of his stock and resignation. He bargained for its sale on the twenty-fourth of September, 1881, and orally resigned his office of director, so far as he so could, to the president of the bank, in his place of president at the bank. This was prior to the time of any of the losses as alleged. He delivered the stock certificate, with authority to transfer, on the seventh of October following, and received his pay for it. This may be after some of the losses occurred. The transaction of September 24th may therefore be of importance. The statutes provide that every director must own in his own right at least 10 shares of the capital stock of the association of which he is a director; and that any director who ceases to be the owner of 10 shares of the stock shall thereby vacate his place. Rev. St. U. S. § 5146. The purpose of this statute obviously is to require the office of director to be kept in the hands of those who are personally and pecuniarily interested in the affairs of the bank. When Cushing bargained his stock, he ceased to be so interested. Good faith to the other shareholders, as their interests were guarded by these provisions of the law, would seem to require that he should then cease to be a director. He appears to have taken this view, and to have done what he could to carry it out. There was no calamity impending or contemplated by him to be avoided by vacating his office, or which he could prevent by retaining it. There was no reason why he should not resign if he could. He was an officer elected to his place; it was an office that he was not obliged to accept, and would seem to be one that he was not obliged to hold. *U. S.* v. *Wright,* 1 McLean, 509; *People* v. *Porter,* 6 Cal. 26; *Olmsted* v. *Dennis,* 77 N. Y. 378. No mode of resignation was provided by law, and an oral one would be as good as any. *Rex* v. *Mayor of Rippon,* 1 Ld. Raym. 563. The president was the head of the board of directors, who alone could fill the vacancy, and a resignation to him would be a resignation to the board. *Port Jervis* v. *First Nat. Bank,* 96 N. Y. 550. The statute provides that the directors shall be elected at meetings to be held on such day in January of each year as shall be specified in the articles of association, and that they shall hold office for one year, and until their successors are elected and have qualified. Section 5145. It is urged that this section prohibits resignation during the year. This is not, however, understood to be its effect. The apparent purpose of the provision in regard to the term of office is to make it conform to the time of the new election, and not to absolutely require every director to serve the full term. Such provisions as to terms of office are common for this purpose. It is said in argument that, if he might resign, he would not be relieved from duty until his place should be

filled by the remainder of the board; and that, if they would not fill it without, it would be incumbent on him to compel them by *mandamus* or other appropriate proceeding to fill it. But until he had vacated the place there would be no vacancy which they could fill; and, when he had sold his stock, he would be out of the corporation, and would have no interest or standing upon which to institute any proceedings whatever to affect the conduct of its affairs. The interests of the corporation would be left with the other directors elected by the stockholders, whose duty it would be, and on whom the stockholders had relied, to fill the vacancy, or act upon it as they should be advised. Upon these considerations it appears that the defendant Cushing was not a director at the time of the alleged losses, and cannot be held for any duty as such at that time.

The liability of Charles T. Coit also stands upon different footing from that of any of the others. His health had failed, and was failing him, so that he was and was being disabled for the performance of the duties of his office. He had owned more than half of the stock up to near that time, and, so far as appears, had been diligent and faithful in the performance of all his duties. Of his associates in the board, Vought had been director since 1875, Lee since 1877, and Francis E. Coit then since the May previous, and for several years at a time previous, and all were in good repute. He could resign, or accept their leave of absence, which was tantamount to an undertaking and assurance on their part that they would perform the duties which might otherwise devolve upon him. They were a majority of the board, and, if they would, could control, whether he was present or absent. The oath of office required by law bound him, so far as the duty devolved on him, diligently and honestly to administer the affairs of the bank. Section 5147. The duties which they could perform, and assumed to and did perform, would not appear to have devolved on him so as to make him chargeable in any degree for the manner of their performance. He did nothing himself for which it is claimed that he became in any manner chargeable; and it does not appear that he was so responsible for what the others did that their misdoings could make him chargeable.

Neither Lee, nor the executrix of Vought, make any defense to this suit, and the bill has been taken for confessed against them.

The positions of Francis E. Coit, Spaulding, and Johnson, with reference to the bank, were so similar in most respects that the questions as to the liability of each of them may be examined somewhat together. It is necessary for this purpose to look into the manner of the losses more closely.

The losses appear to have begun by the discount of the paper of persons engaged with Lee in business and speculations not adequately responsible for the amount of the discounts. The paper was usually indorsed by him, and sometimes secured, to some extent, by collaterals resulting from the avails of the discounts. Great losses from the transactions in which he was engaged fell upon him, and, through him, upon the bank. As the paper fell due, it was renewed or replaced by other

paper of like character, until a large part of the loans and discounts of the bank consisted in these notes of irresponsible persons indorsed by him. All these discounts, renewals, and substitutions were correctly entered, as in the usual course of business, upon the books of the bank, and appeared there fully with the entries of its other current business. These discounts were in violation of the prohibition in the banking law of an excess of one-tenth the amount of capital paid in of any person, company, or firm for money borrowed. Section 5200. They did not, however, appear to be so always or generally, for they might be, so far as they showed, commercial or business paper actually owned by the person negotiating them, within the provisions of the same law allowed to be discounted. On January 18, 1882, he took from the cash of the bank $23,680, and put a slip of paper, with his name and the amount upon it, in place of the money in the cash drawer, and on February 15, $16,-737.50 in like manner, without giving any other evidence of his indebtedness for these amounts. The former amount was reduced, by replacements of cash, to $12,405, and the latter to $11,435. These transactions were not concealed from the cashier or employes in financial matters of the bank, but did not appear on the books of the bank, except that they were shown on the cash blotter of the teller. These were clear violations of the provisions of the banking law mentioned. As Lee was the president and at the head of the bank, and was supposed by the cashier and subordinates to be a man of integrity and wealth, and these things were done by him and by his direction, they excited no suspicion among these persons that loss to the bank would be occasioned thereby until the very last days of the business of the bank, after all these losses had been incurred. As the suspicions of these persons were not aroused, they said nothing to any of the directors about what was going on, and they had no knowledge, supposition, or suspicion but that the business of the bank was proceeding lawfully, regularly, and prosperously. In the banking law it is further provided that if the directors of any bank shall knowingly violate, or knowingly permit any of the officers, agents, or servants of it to violate, any of the provisions of that law, every director who participated in or assented to such violation shall be liable for all damages sustained in consequence of such violation. Section 5239. It is not claimed that any of these three directors so knowingly permitted or assented to any of these violations of this law as to become liable at all under this provision.

As there was no misconduct, default, or irregularity on the part of the cashier, or of the clerks or agents of the bank in any respect that occasioned these losses, and what was done that did occasion them was done by Lee, and by his express direction, the question is whether these directors by their conduct became liable to the bank for what their associate director Lee did. By the bank act of 1864 it was enacted that these associations should be bodies corporate, and, by the names designated in their organization certificates, should have succession for 20 years unless sooner dissolved; that by such names they might make contracts, sue and be sued, and elect or appoint directors, and by their boards

of directors appoint officers, and exercise under that act all such incidental powers as should be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, by loaning money on personal security, and by obtaining, issuing, and circulating notes according to the provisions of that act. 13 St. at Large, 100, § 8. Some courts were of the opinion that this specification of the means by which the powers granted might be exercised was a limitation of the general expression preceding it. *Wiley* v. *First Nat. Bank,* 47 Vt. 546; *First Nat. Bank* v. *Ocean Nat. Bank,* 60 N. Y. 278; *Weckler* v. *First Nat. Bank,* 42 Md. 581; *Whitney* v. *First Nat. Bank,* 50 Vt. 388. Others construed this part of this section as if it had stopped with the general words. *National Bank* v. *Graham,* 79 Pa. St. 106; *Pattison* v. *Syracuse Nat. Bank,* 80 N. Y. 82. The business of banking, in either view, was, as that section then stood, to be carried on by the board of directors. In the Revised Statutes as enacted in 1874, this part of that section was brought into the seventh subdivision of section 5136, and so added to as to authorize a national bank to exercise, by its board of directors or duly-authorized officers or agents, subject to law, the powers mentioned. After this alteration in the law the business of the banks could be lawfully done by the president, cashier, or other officer, as well as by the directors themselves. It was not necessary that the directors, or a majority of them, or any of them, should take part in individual transactions in the authorized business. It is said, in some books and in argument, that the directors are trustees of the funds and property of the bank. This may be true in some sense and under some circumstances; but the relations of the directors to and their duties towards the assets of the bank cannot be determined properly upon names merely. The bank, being a body corporate under the law, is a person, although artificial, with legal identity, and capable of owning and holding its own property; and its property, in the hands of those by whom it acts, is held by itself, for itself, and not by any other person for it. Therefore the directors are not, and from the nature of things cannot be, chargeable for the assets of the bank as for property to which they have taken title or possession for some use or purpose, for the carrying out of which they may be charged and held. They have no ownership in or title to the assets, and cannot act otherwise than as the officers and agents of the bank about them, unless they actually misappropriate them, and thereby become wrong-doers about the assets themselves. They cannot be held to account for any assets they have not themselves had. These directors are not, and are not claimed to be, chargeable in this view. As the statute provides what directors shall be liable, and how, for violations of the statutes, other directors cannot be made liable for those things without, in effect, adding to the statute.

Directors may doubtless be liable for many things which are not express violations of the statute. *Brinckerhoff* v. *Bostwick,* 88 N. Y. 52, and 99 N. Y. 185, 1 N. E. Rep. 663. This would probably be the case with respect to any gross mismanagement in the actual transaction of the bank's

business, or the handling of its property. These directors are not sought to be charged in this view. The complaint against them is not that they acted negligently or carelessly in actually doing anything, but that they neglected to do anything. What they did not do, the omission to do which caused damage, was the restraint of Lee in what he did. So the real question is whether they are chargeable for the consequences of what he did, because they did not prevent it. He was a director elected by the stockholders, and of equal rank and authority with them. He derived his authority from the stockholders, and not from them, and acted under that authority. The president has no greater authority, as such, about the matters complained of, than any other director. They had no reason to suppose that he would not act honestly and fairly within the law, any more than the stockholders had, who had repeatedly elected him to the office of director; or than the depositors had, who trusted the bank while visibly under his management. He was apparently more interested in the success of the bank, during the time of these losses, than any one else, for he held more than a majority of all the stock. The question is not as to the liability of the bank for the negligence of its agents, but is as to the liability to the bank of some agents for not controlling others. The bank itself would not be liable to others for the frauds or thefts of its cashier or other officers unless his untrustworthiness was known, and his employment continued notwithstanding notice of that fact. *Foster* v. *Essex Bank*, 17 Mass. 479; *Prather* v. *Kean*, 29 Fed. Rep. 498. The obligation of the corporation would be measured by the duty of its officers, and the liability of one officer for the misdoing of another would not appear to be any greater than that of the corporation for acts of the same nature. Generally, one officer is not liable for the misconduct of another not appointed by him. *Whitfield* v. *Le Despencer*, Cowp. 754; *Nicholson* v. *Mounsey*, 15 East, 384; *Dunlop* v. *Munroe*, 7 Cranch, 242. Directors of banks and other corporations appear to stand on the same footing as other officers in this respect. The body of directors of a national bank is charged with the supervision and management of its officers, and is bound to use as much diligence and care as the proper performance of these duties requires. Mor. Corp. § 571; Thomp. Liab. Off. 356. But this obligation does not appear to require every director to attend himself to every part of the corporate business, nor make each liable for every act done by any of them. They do not undertake each for the others.

In *Cargill* v. *Bower*, 10 Ch. Div. 502, it was held that directors were not liable for the frauds of their co-directors unless they participated in the frauds, or wholly abstained from inquiry in order that they might be committed. FRY, J., said: "I think that there was great negligence, but that it was merely negligence, and undue trust in Feigan, and that there was not any intention to allow him to commit fraud, and therefore I cannot hold them responsible for his acts." Feigan was a director.

In *Perry's Case*, 34 Law T. (N. S.) 716, Perry had consented to be a director at the request of Duncan, on the understanding that his qualification in paid-up shares would be found for him, and was appointed

August 5, 1871, attended a meeting January 25, 1872, and resigned in May, 1872. Duncan misapplied funds in February, 1872, for which Perry, with others, was sought to be charged. As to this BACON, V. C., said:

"I think that no case is made against Mr. Perry. Mr. Bradford's argument is that, inasmuch as he accepted paid-up shares in order to qualify him as director, he is to be treated as the paid agent of Mr. Duncan to do whatever Mr. Duncan desired him to do. It is very easy to say that, but I see no kind of foundation for it. It is said that Mr. Duncan misconducted himself in various ways, and that Mr. Perry is liable for all the consequences of that because he was Duncan's paid agent. It would be monstrous to entertain any such a proposition. He became director, and is liable for all that he did as director, but he was not bound to attend every meeting of the directors. It is not part of the duty of a director to take part in every transaction which is conducted at a board meeting. His business or his pleasure may call him elsewhere, and it would be a most unheard-of thing to say that if anything wrong was done at a board meeting, he being named among the directors, but not present, he is liable for what is done in his absence."

In *Joint-stock Discount Co.* v. *Brown*, L. R. 8 Eq. 376, in speaking of the liability of directors for acts of others in which they took no part, or measures to prevent, JAMES, V. C., said:

"Now, with regard to Mr. Gillespie, I have held that there is no sufficient evidence of his concurrence or connivance to make him responsible. I have, however, thought it not right to give him his costs, although I dismiss him from the suit, because I think a man who is director, and goes on as director for months when a transaction of this kind is going on, is not justified in saying: 'I really did not pay the slightest attention to it. I had a sort of vague notion of what was going on. I was a paid director, but I left it to the other directors to attend to. I did nothing. I took for granted it was all right.' I think he is entitled to go; that I cannot fix him with liability; but I think it is not too much of a penalty for him to pay for his negligence that he shall not have any costs of the proceedings which have been rendered necessary in this court by proceedings of his co-directors which he took no pains to inquire into or interfere with."

In *Weir* v. *Bell*, 3 Exch. Div. 238, in speaking of the liability of Bell as a director, Lord Chief Justice COCKBURN said:

"In the result Bell has been guilty of no fraud. He is not a principal deriving a benefit from a fraud committed by his agent in procuring that benefit; nor, indeed, has he derived any benefit from the fraud committed by the subagents whom he was authorized to employ on behalf of the company. Upon this state of facts I think the plaintiff fails to establish the liability of the defendant Bell."

The same views pervade other English cases. *Turquand* v. *Marshall*, L. R. 4 Ch. 386; *Land Credit Co.* v. *Lord Fermoy*, L. R. 8 Eq. 7. In *Charitable Corporation* v. *Sutton*, 2 Atk. 400, much relied on for the plaintiff in this case, only the committeemen, who formed what was called a confederacy or conspiracy, were held chargeable.

That a director is not liable for the faults or frauds of a co-director appears to be well recognized in New York. *Wakeman* v. *Dalley*, 51 N. Y. 27; *Arthur* v. *Griswold*, 55 N. Y. 400. In *Hun* v. *Cary*, 82 N. Y. 65, where the trustees of a savings bank who participated in a misappropria-

tion of the funds resulting in loss were held liable for the loss, Smith, a trustee, who took no part in the transactions, does not appear to have been held. And in *Hand* v. *Burrows*, 23 Hun, 330, supreme court, First department, June, 1881, it was held (BARRETT, J.) that the directors of a national bank who knowingly participate in retaining an untrustworthy cashier were liable for his subsequent defalcations, and that one who did not know of the untrustworthiness was not liable; which case does not appear to have gone any further. There is no case which has been cited or observed in which it has been decided that a director of a corporation was liable to make good a loss occasioned by the fraud or misconduct of a co-director, in which he had no part, and which was perpetrated without his connivance or knowledge. *Robinson* v. *Smith*, 3 Paige, 222; *Brinckerhoff* v. *Bostwick*, 88 N. Y. 52, and 99 N. Y. 185, 1 N. E. Rep. 663; *Ackerman* v. *Halsey*, 37 N. J. Eq. 356, and 38 N. J. Eq. 501; *Hodges* v. *New England Screw Co.*, 1 R. I. 312, and 3 R. I. 9.

The measure of the duty of directors is frequently and emphatically laid down, and is clear and plain; but it is nowhere adjudged that all must always act, or that they must not trust one another to act, or that any are liable for the mere omission to watch and restrain the others, without wrong intention on their own part, or actual knowledge of the wrong on the part of the others. Neither are there cases where persons standing in similar relations to the property of others have been held liable for the acts of others standing in the same relation, without some fraud or connivance on their own part. The general rule as to trustees is that they are responsible only for their own acts, and not for the acts of each other, unless by express agreement, " or they have by their own voluntary co-operation or connivance enabled the other to accomplish some known object in violation of the trust." Story, Eq. § 1280. In Perry on Trusts the law is stated to the same effect. Section 417. The law is the same as to executors and administrators. Bac. Abr. "Executors," D; *Brazer* v. *Clark*, 5 Pick. 96; *Peter* v. *Beverly*, 10 Pet. 532. In the latter case, Mr. Justice THOMPSON said: "For it is a well-settled rule that one executor is not responsible for the *devastavit* of his co-executor any further than he is shown to have been knowing and assenting at the time to such *devastavit* or misapplication of the assets; and merely permitting his co-executor to possess the assets, without going further and concurring in the application of them, does not render him answerable for the receipts of his co-executor. Each executor is liable only for his own acts, and what he receives and applies, unless he joins in the direction and misapplication of the assets. *Hargthrope* v. *Milforth*, Cro. Eliz. 318; *Hovey* v. *Blakeman*, 4 Ves. 596; *Briggs* v. *Law*, 4 Johns. Ch. 23; *Manahan* v. *Gibbons*, 19 Johns. 427." And a bailee of goods without reward is only liable because they actually come to his hands, and he is guilty of some wrong in respect to them while there. *Coggs* v. *Bernard*, 2 Ld. Raym. 909.

After the careful and thorough presentation of this case in all its aspects by counsel on all hands, and much and repeated consideration of the facts and principles involved, no just ground of liability on the part

of these directors is perceived,—not on the express provisions of the statute on the subject, for they do not, and are not claimed to, come within that; not by the common law, for by that each is liable only for his own miscarriages, and none are shown.

These conclusions make it unnecessary to consider whether this cause of action, if made out, would survive against the personal representatives of Francis E. Coit, or those of Charles T. Coit. The bill must, upon the conclusions reached, be dismissed as to them, and as to the defendants Cushing, Spaulding, and Johnson. The expressions of Vice-chancellor JAMES, as to costs, in *Joint-stock Discount Co.* v. *Brown, supra*, seem reasonable, and applicable to the directors Francis E. Coit, Johnson, and Spaulding; and no costs were allowed in *Hand* v. *Burrows, supra*, to the director not held to be liable. Those cases are followed, and no costs are allowed to the defendants Johnson and Spaulding and the representative of Francis E. Coit. There is nothing sufficient to take the cases of Cushing and Charles T. Coit out of the usual rule as to costs. No question has been made as to completion of the decrees already entered against Lee and the executors of Vought.

Let a decree be entered dismissing the bill of complaint as to the defendants Spaulding, Johnson, and Caroline E. Coit, executrix, without costs; and as to the defendant Cushing and the defendants Frank S. Coit and Joseph C. Barnes, administrators, with costs.