## COCKRILL v. ABELES et al.

### (Circuit Court of Appeals, Eighth Circuit. April 11, 1898.)

#### No. 969.

1. RECEIVER—INSOLVENT CORPORATION—SUIT AGAINST DIRECTORS.
   A receiver of an insolvent national bank has a right to maintain a suit in his own name against directors to charge them for losses that may have been sustained by the corporation and its creditors through their wrongful or fraudulent acts.

2. NATIONAL BANKS—INCREASE OF CAPITAL STOCK—LIABILITY OF DIRECTORS.
   The increase of the capital stock of a bank based on a fictitious value of assets, and on notes given by the directors, with an understanding that they were not to be paid, is in violation of Rev. St. § 5142, and the directors of the bank participating are liable for all losses resulting to the creditors.

3. SAME—ACQUIREMENT OF REAL ESTATE—SATISFACTION OF LIEN.
   Where a national bank has lawfully acquired an interest in real property, in satisfaction of a debt, it may purchase other undivided interests therein or incumbrances existing thereon, provided such action is necessary to enable it to manage or dispose of the property to better advantage.

4. SAME—OPERATING MANUFACTURING PLANT.
   Where a national bank acquired certain mill property, in satisfaction of a debt, and the directors organized a corporation among themselves for the purpose of operating the mills as the bank's agent, using its funds, and operated them for the bank at a loss of $23,000, the directors of the bank participating are liable to the creditors for the loss.

Appeal from the Circuit Court of the United States for the Eastern District of Arkansas.

J. M. Moore and Sterling R. Cockrill (Ashley Cockrill, on brief), for appellant.

John McClure and W. E. Hemingway (U. M. Rose, G. B. Rose, E. W. Kimball, and Morris M. Cohn, on brief), for appellees.

Before SANBORN and THAYER, Circuit Judges, and PHILIPS, District Judge.

THAYER, Circuit Judge. This case is similar in some respects to the case between the same parties, No. 968, which was recently decided. 86 Fed. 7. It involves the same questions, touching the one-year statute of limitations, and the right to sue in equity, which were considered and decided in the former case, and what was therein said with reference to those questions is applicable to the case in hand.

The features of difference which the two bills of complaint present are these:

In the case at bar, the receiver complains of the conduct of the directors in devising and carrying out a scheme which was concocted by them to increase the capital stock of the bank from $250,000 to $500,000, and of certain action which the directors took in endeavoring to secure an indebtedness which a corporation known as the "Quapaw Mills" owed to the bank. These two transactions on account of which, as it is claimed, the directors incurred a personal liability, were as follows: On June 23, 1890, the stockholders of the bank passed a resolution to increase the capital stock of the bank to the extent of $250,000. For the purpose of creating a fund to authorize the increase, the directors placed a fictitious valuation on certain assets of the bank, some of which were of little or no value, thereby showing on the books of the bank that it had a surplus over and above its debts and its stock liability to the extent of $125,949.82. On the strength of this pretended surplus, a stock dividend was declared by the directors in favor of the shareholders, to the amount of 50 per cent. of the stock which they then owned, the increase based on such dividend amounting to $125,000. As a basis for a further issue of stock to the amount of $125,000, certain directors of the bank executed their notes in its favor to the amount of $162,500, it being agreed that such notes should not be paid by the directors at any time, but that the same should be retired by the sale of the new stock to outside parties, as and when the same should be sold. Representations were made, however, to the comptroller of the currency, that the full amount of said increased stock had been paid in; and, by means of such representations, the requisite certificate appears to have been obtained from the comptroller that the capital of the bank had been increased to $500,000. When the bank failed, in January, 1893, it was found that it still held notes to the amount of $62,730, which were signed, respectively, by Nick Kupferle, by the Press Printing Company, and by the Wilson & Webb Stationery Company. These notes had been received by the bank in exchange for the notes originally drawn by the directors to furnish a basis for an issuance of new stock to the amount of $125,000, and represented the amount of such new stock that had not been sold. Prior to that time it seems that the bank had succeeded in selling to actual purchasers about 750 shares of the new stock, receiving therefor $75,000. It had received nothing of value for the remaining shares, although they had been issued and were outstanding in the hands of third parties. The makers of the aforesaid notes, with the exception of the Wilson & Webb Stationery Company, were at the time insolvent, and so remain, and all of them deny their liability thereon. It was averred in the bill that the directors caused a report under oath to be made to the comptroller of the currency that all the new capital stock had been paid in, and that by this means the comptroller was deceived, the public was misled, and the bank was given a false credit. The new stock, amounting to $125,000, which was based on the notes of the directors, was originally issued in lots of 250 shares each, to the five directors who executed their notes as a basis for the issue. Before the bank failed, however, most of

the unsold stock had been surrendered by the original holders, and re-issued to H. G. Allis, the president of the bank, who had either sold or hypothecated a large part thereof in his individual transactions, the result being that the bank had received nothing of value at the time of its failure for some five or six hundred shares of its capital stock which had thus been sold or hypothecated, except the notes of Nick Kupferle, the Press Printing Company, and the Wilson & Webb Stationery Company.

The Quapaw Mills transaction was of the following character, according to the averments of the bill: The Quapaw Mills property consisted of certain lots in the city of Little Rock, Ark., upon which a cotton mill had been erected. On June 12, 1891, the title to this property was vested in the defendant P. K. Roots, and in Oscar Davis, as trustees for the First National Bank of Little Rock, and the German National Bank, of the same place. On that day, the directors of the first-named bank, who are defendants to the present bill of complaint, purchased the interest of the German National Bank in said property for the sum of $3,000, using for that purpose the money of the First National Bank. The directors of the latter bank then caused a corporation to be organized under the name of the Little Rock Cotton Mills, for the purpose of enabling the bank to operate the cotton mills. To this corporation the cotton mills property was conveyed by the trustees, Roots and Davis, on or about June 12, 1891, to be held by it in trust for the bank. Four of the directors of the First National Bank became directors of the cotton-mills company, and the mills were operated for the benefit of, and at the expense of, the bank, until about November 1, 1892, during which period the sum of $23,000 of the bank's money was lost in an attempt to conduct the business successfully. In March, 1893, the directors of the Little Rock Cotton Mills caused that corporation to execute a mortgage on its property to secure notes in the sum of $4,000 which the cotton-mills company had executed in favor of its directors for money claimed to be due to them. These notes were subsequently sold by the directors to third parties. A few days later, a second mortgage was executed on the cotton-mills property, to secure the sum of $23,000 which the First National Bank had advanced as aforesaid in an attempt to operate the plant. That indebtedness, it seems, was represented at the time by notes of the cotton-mills company then outstanding, a portion of which, amounting to $8,000, were held by the First National Bank when it failed, and the residue of which were held by third parties to whom the notes had been sold. The cotton-mills property was subsequently sold under a decree of the circuit court of the United States for the Eastern district of Arkansas for $15,000; and, by the provisions of said decree, the sum of $4,605.29 was paid to the receiver of the First National Bank on the notes held by him, which were secured by the second mortgage. The sum of $1,314.44 was also paid out of the proceeds of the sale to redeem the cotton-mills property from taxes and other charges. The balance of the proceeds of the sale was paid to the holders of the other notes, the result being that the First National Bank and its receiver ultimately lost the sum of $3,000 which was paid to the German National Bank for its interest in the Quapaw Mills prop-

erty; also the money which the bank had advanced to operate the mills, except the sum of $4,605.29, above mentioned.

The bill in this case was dismissed by the circuit court solely on the ground that the cause of action was barred by the one-year statute of limitations of the state of Arkansas. This view of the case was erroneous, we think, for the reasons stated in our opinion in the former case between the same parties. It is urged, however, by the appellees that, even if the statute of limitations was not applicable to shield them from liability, the bill was properly dismissed for other reasons, the principal contention being that the transactions complained of, as described in the bill, do not show that any loss or damage was sustained which the receiver is entitled to recover. It becomes necessary, therefore, to consider this contention. In doing so, however, we shall not notice defects of averment which could be easily cured by amendment, such, for instance, as the failure to aver specifically that the directors acted in bad faith and negligently, but shall direct our attention to the more important inquiry whether it is shown with sufficient certainty that the two transactions resulted in a loss which is recoverable by the receiver.

It is well settled that the receiver of an insolvent national bank represents both the corporation and its creditors. He is a statutory assignee of all its property and effects, and is therefore entitled to sue in his own name to recover the same, and to enforce all the rights of the corporation without making the corporation or its creditors a party to such suits. Kennedy v. Gibson, 8 Wall. 498, 506; Bank v. Kennedy, 17 Wall. 19; Rev. St. U. S. § 5234. The receiver of an insolvent bank or other corporation, who has been duly appointed under the provisions of a statute to wind up its affairs and distribute its assets among creditors and stockholders, also has the right to maintain a suit in his own name against unfaithful directors, or other managing officers, to charge them with responsibility for losses that may have been sustained by the corporation and its creditors through their wrongful or fraudulent acts, or in consequence of a gross neglect of their official duties. Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924; Gillet v. Moody, 3 N. Y. 479; Bank v. Johnson, 8 Wend. 645; Alexander v. Relfe, 74 Mo. 495; Movius v. Lee, 30 Fed. 298; Thomp. Corp. §§ 4121, 6946, 6947, and cases there cited. It is also well settled that, when the capital stock of a national bank is increased, the law requires an amount of additional capital equal to the increased stock to be actually paid in or contributed. The provision to that effect found in section 5142 of the Revised Statutes was intended to prevent the watering of stock, and to give the creditors of a bank whose shares of stock are increased additional security to the full amount of the par value of the new stock. The national bank act does not sanction any shifts or devices whereby the stock of a bank is increased without a corresponding increase of actual capital. Aspinwall v. Butler, 133 U. S. 595, 608, 10 Sup. Ct. 417; Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39. There can be no doubt, then, that the scheme devised by the appellees, who were the directors of the bank, to increase its stock, as the same is described in the bill, was wholly unauthorized by law; and if the acts done resulted in a loss to the bank,

and through it to the bank's creditors, considered as a body, the directors, or so many of them as participated in the scheme, are clearly liable for the loss.

With respect to the stock dividend of $125,000 which was based on a fictitious valuation of certain property of the bank, it is said that it did no harm to the bank or its creditors, because the bank parted with none of its assets; and, with respect to the increase of stock based on the notes of its directors, it is said that the bank actually realized about $75,000 in money from the sales of that stock, and was benefited to that extent, and that the disposition made of the residue of that stock did no harm. This contention, however, overlooks the fact that, after the resolution to increase the stock to the amount of $250,000 had been adopted, the stock itself was an asset of the bank, which its depositors and creditors were entitled to have dealt with as the law directs. It was a trust fund which the directors had no right to issue except for money or something equivalent to money. Sanger v. Upton, 91 U. S. 56, 60; Wood v. Dummer, 3 Mason, 308, Fed. Cas. No. 17,944; Foundry Co. v. Killian, 99 N. C. 501, 6 S. E. 680; Moses v. Bank, 1 Lea, 398; Thomp. Corp. §§ 1562, 1606, 1608; Mor. Priv. Corp. §§ 780, 781. If the directors had treated the new stock as a trust fund, and had disposed of it for money or its equivalent, it is obvious that the capital of the bank would have been largely increased, and that such increase of capital would have afforded its creditors greater security. It is possible, of course, that purchasers could not have been found for an amount of stock in excess of the 750 shares actually sold, if payment of the par value thereof had been exacted in money. It is also possible that, if the stock had been sold in the manner provided by law, the money received therefor would have been wasted in reckless ventures, and would not have inured to the benefit of the present creditors of the bank. But we are not at liberty to assume, in the absence of any evidence to that effect, that such would have been the result, and, on the faith of that assumption, decide that no one was injured by the unauthorized acts of the directors. In the absence of proof to the contrary, it must be presumed that the new stock might have been sold for its par value; that a valuable asset was in fact lost by the wrongful conduct of the directors; and that the creditors of the bank thereby sustained a substantial injury.

The other transaction, whereby 1,250 shares of stock of the par value of $125,000 were issued, based on the notes of the directors which they never intended to pay, seems to have been no less detrimental to the interests of the bank and its creditors. About five or six hundred shares of that stock, according to the averments of the bill, were ultimately issued to the president of the bank, who sold and hypothecated the same, probably to innocent holders, to discharge or secure his individual debts. For these shares the bank received nothing but fictitious and worthless notes, which the directors had agreed should never be enforced against the persons who had executed the same. An innocent purchaser of the stock in question could not be made to respond to the bank or its receiver for the amount unpaid thereon, but would be entitled to insist, as against the creditors of the bank and its other shareholders, that the stock was what it professed

to be on its face, namely, full-paid stock. The same would be true of the shares that were issued as a stock dividend to the old stockholders. Many of those shares have doubtless been sold to persons who, if sued for the amount due thereon which has not been paid, would be entitled to claim exemption from liability on the same ground, namely, that they bought them in good faith as full-paid stock, and that neither the bank nor its receiver should be heard to allege the contrary. Foreman v. Bigelow, 4 Cliff. 509, 9 Fed. Cas. 427; Steacy v. Railroad Co., 5 Dill. 348, Fed. Cas. No. 13,329; McCraken v. McIntyre, 1 Duv. (Can.) 479; Bridge Co. v. McCluney, 8 Mo. App. 496; Burkinshaw v. Nicolls, 3 App. Cas. 1004; Thomp. Corp. § 1680.

In view of these considerations, we are of opinion that the bill shows not only that the directors acted in open violation of the national bank act, and therefore unlawfully in the various proceedings taken by them to increase the stock of the bank, but that, by reason of the wrongful acts in question, a considerable amount of the stock has been dissipated and lost, from which the corporation should have realized its par value in money. In other words, the case made by the bill is not one in which the directors appear to be liable merely for nominal damages because of certain unlawful acts by them done and performed, but it is one in which it appears that such unlawful acts have resulted in the waste of a valuable asset, and in a substantial loss to the bank and its creditors. It may be, as we have heretofore suggested, that the directors will be able to show that the increased stock could not have been sold for money or its equivalent; that the stock would still be in the hands of the bank and unsold, if it had not been disposed of in the manner aforesaid; and that neither the bank nor its creditors have sustained any actual damage in consequence of the fraudulent and unlawful acts charged in the bill. We think, however, that we cannot indulge in such presumptions as these, and that it is incumbent on the directors to allege and prove such facts if they seek to avoid liability for their wrongful conduct on that ground.

It is further claimed by the appellees that they are not liable for the loss sustained in the Quapaw Mills transaction, because they acted in that matter not unlawfully, but in good faith, and with intent to benefit the bank. It is said, in substance, that the bank had been compelled to accept a little more than a four-fifths interest in the Quapaw Mills property, in satisfaction of a debt due to it from a former · owner of the mills property; that the property was idle and unproductive; and that the directors, in the exercise of their best judgment, purchased the small interest of the German National Bank therein, and organized a corporation to repair and operate the cotton mills for the sole purpose of enhancing their value, and enabling the bank to ultimately dispose of the property to the best advantage. On the other hand, it is urged by the receiver that the bank, under its charter, had no power to purchase the interest of the German National Bank in the property in question, it being real estate, and that, because of such want of power, the directors are personally liable for the sum of $3,000, which was expended in making the purchase, and was ultimately lost. It will be admitted, of course, that a national bank has no power to purchase real property, except such as may be necessary

for the convenient transaction of its business, or such as it may be compelled to take as security for, or in satisfaction of, debts previously contracted. Rev. St. § 5137. We think, however, that when a national bank, as in the present case, has lawfully acquired an undivided interest in real property in satisfaction of a debt, it may lawfully purchase other undivided interests in the property, and discharge liens or incumbrances existing thereon, provided such action is necessary to enable it to manage or dispose of the property to better advantage. The power conferred by the statute to acquire real estate in satisfaction of a debt is not exhausted by acquiring simply an undivided interest in such property, but it extends to the acquisition of all interests in the property, if an undivided control and ownership thereof is deemed necessary for the ultimate security of the bank. In many cases the right accorded to national banks to take real estate as security for debts previously contracted would prove a barren right if they were limited to such an interest as was first acquired, and were denied the right to purchase other outstanding titles and interests. Inasmuch as the power in question was conferred upon national banks for the sole purpose of enabling them to save as much as possible of bad or doubtful debts, it should be liberally construed so as to make it most effectual to that end. It results from this view that we are not able to assent to the proposition that the directors are liable for the sum of $3,000 which was expended in purchasing the interest of the German National Bank in the mills property, because that act was in excess of the power of the corporation, and therefore a wrongful act on the part of the directors. We hold, on the contrary, that the directors had the power to make the purchase in question, if, in the exercise of their best judgment, they deemed it necessary to do so to protect the interest of the bank, and to save as much as possible of the money already invested in the mills property.

The receiver claims, however, that, according to the averments of the bill of complaint, the directors of the bank also embarked its funds in a manufacturing enterprise which resulted in a large loss, and that such conduct on their part was a breach of trust, which renders them personally liable for whatever damage was thereby sustained. This contention on the part of the receiver as to what the bill charges seems to be well founded. The bill does not aver that the cotton-mills company paid anything for the property which was conveyed to it by Roots and Davis, or that it agreed to pay anything therefor, or that the conveyance was in the nature of a lease; while it is expressly alleged that such conveyance was made to it "in trust for the bank," and that the mills were thereafter operated for and at the expense of the bank, resulting in a loss of $23,000. In other words, it appears by averment, at least, that the cotton-mills company acted merely as an agent of the bank in the operation of the mills, and that whatever risk of loss was incurred by so doing was borne by the bank. If this be true, and it so appears on a further hearing of the case, it follows, we think, that the directors, or so many of them as assented to such use of the bank's funds, will be liable to respond for the loss which was incurred in operating the mill property. In the case of Butler v. Cockrill, 36 U. S. App. 702, 712, 20 C. C. A. 122, and 73 Fed.

945, which related to the same transaction now under investigation, this court said, in substance, that it would not be difficult to show that the bank did have the power to lease the mills property to a third party to be by him operated, or to convey the same to a third party under an agreement that he should operate it and sell it, and account to the bank for its proceeds. But we cannot concede that the bank itself had the right to operate the mill, either in its own name or in that of an agent, and incur the risks which are necessarily incident to a business venture of that nature. The present case shows the hazards which attend such ventures, and the necessity, on grounds of public policy, of denying to national banks the right to become interested therein. The most liberal view which may be fairly taken of the implied powers of national banks would not sustain their right to engage directly in a manufacturing or business enterprise under any circumstances; but, even if the power in question should be conceded to exist under certain conditions, the present case was not one which warranted its exercise. The directors of the bank had no right to employ its funds in an attempt to operate the cotton mills for the bank's account, in the manner alleged in the bill, and such action on their part was unauthorized and wrongful.

It is suggested by counsel for the directors that the cause of action against them, which is founded upon the declaration of the stock dividend in the year 1890, was barred by the laws of Arkansas (Sand. & H. Dig. 1894, § 4822) after the lapse of three years, which period had expired when the present suit was instituted by the receiver. Other derelictions of duty, however, which are charged in the bill, as heretofore shown, gave rise to a cause or to causes of action which are not barred, and, even if the point suggested is well taken, it would not follow that the decree dismissing the bill should be affirmed. Moreover, the complaint alleges, in substance, that at the time of the commission of the wrongful acts in question, and afterwards, until the appointment of a receiver, the defendants who were concerned therein constituted a majority of the directors, and that, in consequence of their having full control of the corporation, no suit could be brought to redress the alleged grievance, until a receiver was appointed. In view of these considerations, and because all the transactions relating to the increase of the stock must be fully investigated in the further progress of the case, it is deemed both unnecessary and inexpedient to express a decisive opinion upon the point last suggested. Our conclusion is, therefore, that the bill, considered as a whole, stated a good cause of action against the directors; that the general demurrer which was interposed should have been overruled; and that the defendants should have been required to answer its averments. The decree of the circuit court is accordingly reversed, and the case is remanded to that court for further proceedings therein not inconsistent with this opinion.

SANBORN, Circuit Judge. I concur in the order reversing the decree in this case, because the bill shows that the appellees unlawfully diverted some of the funds of the insolvent bank to the payment of unearned dividends to themselves and other stockholders (Hayden v. Thompson, 36 U. S. App. 361, 17 C. C. A. 592, and

71 Fed. 60); but I am unable to assent to the view that the bill sufficiently sets forth any cause of action against the appellees on account of the Quapaw Mills transaction (Butler v. Cockrill, 36 U. S. App. 702, 712, 20 C. C. A. 122, 127, 128, 73 Fed. 945, 951, and cases cited), or on account of the declaration and distribution of the stock dividend in 1890,—more than three years before the commencement of this suit (Mansf. Dig. Ark. § 4478); and I think the damages resulting from the disposition of the shares of stock for which the promissory notes for $62,732 were finally obtained cannot exceed the difference between the market value of those shares and the value of the notes which were obtained for them at the time when the shares passed beyond the control of the bank. It was the duty of the directors to hold these shares for their par value; but no absolute duty to sell them for that value was ever imposed upon them, unless some one offered to purchase them at that price. Since the bill does not show that any one made such an offer, which they wrongfully rejected, the measure of damages for their disposition of these shares is not the difference between the par value of the shares and the value of the notes they obtained for them; but the extreme limit of those damages, in my opinion, is the difference between the market value of the shares and the market value of the notes obtained for them at the time the receivers permitted the shares to pass from their possession and control as directors of the bank.

PHILIPS, District Judge. I concur in the concurring opinion herein of Judge SANBORN in the following particulars: In respect of the cause of action based on the distribution of the stock dividend in 1890, I hold that the three-years statute of limitation applies, for the reason that the only trusts which are not reached or affected by the statute of limitations are such technical and continuing trusts as belong to the exclusive jurisdiction of courts of equity and are not cognizable at law. Keeton's Heirs v. Keeton's Adm'r, 20 Mo. 530. I also concur in the view of Judge SANBORN respecting the measure of damages resulting from the disposition of the shares of increased capital stock of the bank. I concur in the view expressed by Judge THAYER respecting the Quapaw Mills transaction, with the qualification that it is based on the averments of the bill, whereby it is made to appear that the directors of the bank acquired and conducted this property as an independent speculation rather than as a means, according to the best judgment of the directors, of securing an indebtedness to the bank. If this property in fact was taken by the directors solely for the purpose of enabling the bank ultimately to secure the debt owing to it, and in the progress of its operation and management it became necessary, in the honest judgment of the directors, to advance the money to enable the mill to be successfully operated, so as ultimately to work out the best interests of the bank in the property, I do not think the directors should be held liable for bad judgment in the transaction.