## WILLIAMS v. MERCHANTS' NAT. BANK OF ST. CLOUD et al.

### No. 304.

District Court, D. Minnesota, Sixth Division. July 19, 1930.

Harold C. Kerr, of Kerr, Nelson, Burns & Mohan, of St. Paul, Minn., for complainant.

R. B. Brower, of St. Cloud, Minn., for defendants.

SANBORN, District Judge.

The suit is in equity against the bank and its stockholders, and the complainant asks for a decree determining that the bank is liable upon certain notes owned by her, and enforcing the statutory liability of the defendant stockholders.

The complaint asserts that the defendant bank is liable under an assumption clause in a deed to certain lands; that an unpaid judgment against the bank obtained by default in the state district court exists for overdue interest on notes; that the bank has been voluntarily liquidated; and that, in order to insure payment of the bank's indebtedness to the complainant, assessment of its stockholders is necessary.

The answer denies that the assumption clause in the deed constitutes a valid agreement on the part of the bank, admits the voluntary liquidation of the bank and the default judgment in the state court, and alleges that the bank has paid to the clerk of this court the amount of such judgment.

In a general way, the facts, so far as they are material, are these:

On November 7, 1919, M. M. Williams was the owner of an improved farm in Morrison county, Minn., containing 530 acres. On that day, he and his wife sold the farm to John Vertin, J. M. Totten, W. L. Roepke, and R. E. Hubbard under a contract for a deed, whereby the purchasers agreed to pay $55,000 as follows: $5,000 as a down payment; $2,500 on or before November 7, 1920; a like amount on or before November 7, 1921; $45,000 on or before twenty years—the deferred payments to bear interest at 6 per cent. The purchasers were given the right to pay $500 or more at any time, and were to be entitled to a warranty deed when the unpaid balance of the purchase price should be $45,000 or less, upon giving a purchase-money mortgage. The purchasers were required to pay taxes and assessments after 1918, and to keep the buildings insured for $10,000.

The defendant bank, a national banking corporation, was organized in 1892, and conducted its business at St. Cloud, Minn., with 1,000 shares of outstanding capital stock, of the par value of $100 a share.

In September, 1921, John Schmolke, one of the customers of the bank, was indebted to it. On September 27, 1921, Schmolke and his wife deeded to the bank a 120-acre farm in Morrison county, Minn., subject to two mortgages aggregating $6,000, due September 27, 1923, and December 15, 1924, respectively. The bank allowed Schmolke $2,000 credit on his indebtedness as a consideration for the deed.

Roepke and Hubbard, who owned an undivided one-half interest in the contract for the Williams farm, entered into negotiations in the late summer of 1922 with L. F. Cary, president of the bank, relative to trading their interest in the Williams farm to the bank and taking the bank's equity in the Schmolke farm. It is the claim of the complainant that the agreement finally reached was that the undivided one-half interest of Roepke and Hubbard in the Williams farm was to be taken by the bank subject to mortgages of $36,000, which the bank was to assume and agree to pay, and that the bank was to deed to Roepke and Hubbard its equity in the Schmolke farm, and to pay, in addition, $2,300. The defendants claim that the agreement was as outlined, except that it was never understood or agreed that the bank should assume the $36,000 of mortgages on the Williams farm.

Whatever the actual verbal arrangement was, it appears that Mr. Williams and his wife executed and delivered a warranty deed to Roepke, Hubbard, Totten, and Vertin dated September 30, 1922, acknowledged and recorded on October 10, 1922, conveying 427 acres of the farm covered by the prior contract; that Roepke, Hubbard, Totten, and Vertin executed and delivered to Mr. Williams their two mortgages, both dated September 30, 1922, and both recorded on October 10, 1922, one of which was given as security for a note of $11,000 and covered 160 acres. It was acknowledged by Roepke on October 6, 1922, by Hubbard on October 5,

1922, and by Totten and Vertin on October 10, 1922. The other mortgage was given as security for a note of $25,000, and covered the balance of the 427 acres, and was acknowledged by the respective parties on the same dates as the $11,000 mortgage. The notes were executed by the mortgagors, and both notes were payable seventeen years after their dates, drew 6 per cent. interest, payable annually, gave the privilege of paying $500 or more on the principal at any time on sixty days' notice, and contained no acceleration clauses.

As a part of the same transaction, and for the purpose of carrying out whatever verbal arrangement had been made with Mr. Cary, as president of the bank, Roepke and wife and Hubbard and wife executed and delivered their warranty deed to the bank dated September 30, 1922, acknowledged by Roepke on October 6, 1922, by Mrs. Roepke on October 7, 1922, and by Hubbard and wife on October 5, 1922. The deed was recorded on October 10, 1922. It conveyed Roepke's and Hubbard's undivided one-half interest in the 427 acres, and contained the following clause:

"That the same are free from all incumbrances; excepting a mortgage of $25,000.00 * * * and a mortgage of $11,000.00 * * *, both mortgages in favor of M. M. Williams, dated September 30, 1922, and due seventeen years from date, bearing interest at the rate of six per cent. per annum, payable annually, which both mortgages said party of the second part hereby assumes and agrees to pay."

All of the deeds, mortgages, and notes to carry out the transaction, with the exception of the deed from the bank to Roepke and Hubbard of the Schmolke farm, were prepared by Vertin, and he attended to having the deeds and the mortgages recorded. On November 19, 1922, Vertin mailed to the bank the deed conveying the undivided one-half interest of Roepke and Hubbard to the bank.

Mr. Williams died testate on October 17, 1926. The complainant inherited his property, which included the notes and mortgages in question, and she is now the owner thereof.

It appears that Roepke, Hubbard, Totten, and Vertin had made, or thought they had made, some other disposition of the 103 acres which was a part of the original contract but was not included in the deed from Mr. and Mrs. Williams to them; that the 103 acres is apparently still covered by the original contract.

The minutes of the meeting of the bank's directors on December 6, 1922, recite: "Mr. L. F. Cary reported that he had exchanged some of the bank's 'other real estate' for equity in a farm west of Little Falls." This refers to the transfer of the Schmolke farm for the undivided one-half interest in the Williams farm.

The bank paid interest on the notes and mortgages to and including September 30, 1926, not, however, without some pressure. On July 14, 1925, Mr. Kerr, as attorney for Mr. Williams, demanded the unpaid balance of interest which had become due on September 30, 1924, and called attention to the fact that the bank had assumed the mortgages. Mr. Cary, for the bank, replied that the land had been sold, which was not the fact. On August 8, 1925, suit was commenced against Roepke, Hubbard, Totten, Vertin, and the bank to recover the interest then due. In the complaint it was alleged that the bank had assumed the mortgages. The bank, Totten, and Vertin paid the amount which was due, and the suit was dismissed. On September 20, 1927, Mr. Kerr wrote the bank a letter demanding $2,160 for interest due on September 30, 1927. After writing some other letters, Mr. Kerr received a reply from Mr. Cary, stating that the bank had gone out of business in May, 1926, and that the farm had been sold to C. C. Schwab, and that he had in turn traded the same with John Vertin. This was inaccurate.

On December 28, 1926, the bank went into voluntary liquidation, and L. F. Cary was appointed its liquidating agent.

On November 25, 1927, the complainant commenced an action in the district court of Ramsey county against the bank, Roepke, Hubbard, and Vertin to collect the balance of the interest due on September 30, 1927, amounting to $1,080. It appears that Vertin had paid one-half of the total amount of interest due. The complaint alleged the assumption of the mortgages by the bank. The defendants defaulted, and judgment was entered against the defendants on January 5, 1928, for $1,109. The judgment was transcripted and docketed in Stearns county, Minn., and execution was issued and returned unsatisfied. No further interest other than that which became due on September 30, 1926, has been paid by the bank, but Vertin has paid one-half of the interest to and including that due on September 30, 1929. At the time this case was tried, there was due on the notes $3,508.85, of which amount the judgment constituted $1,111.50.

The bank has no assets except its interest in the Williams farm, and no liabilities, unless it is liable under its assumption clause in the deed referred to. $2,160 will be due as interest on the two notes on September 30, 1930, and each year thereafter until September 30, 1939, at which time there will also be due $36,000 principal.

The directors of the bank at the time this trade was entered into were H. C. Ervin, J. A. Henry, L. F. Cary, W. Leigh Cary, T. P. Galernault, and C. O. Benson.

The books of the bank, with the exception of the minute books and stock certificate book, were destroyed prior to the commencement of the suit, and just how the transaction was handled on the books of the bank has not been shown.

The defendants have paid into court $1,325, the amount of the state court judgment with interest, and tendered judgment for that amount.

There is a conflict in the evidence as to:

(1) The value of the Williams farm.

(2) Whether the assumption clause in the deed of the undivided one-half interest in the Williams farm to the bank was in accordance with the agreement of the parties.

(3) The time when Mr. Cary discovered that an assumption clause had been included in the deed, assuming that was not known to him at the time the deed was made.

The value of the Williams farm is probably not important. No claim of fraud or overreaching is predicated upon any misrepresentations as to its value. In 1919, when there was an extremely active market for farm lands, it was, no doubt, thought to be well worth the amount which was paid for it. It is a matter of common knowledge that the break in farm land values came between the fall of 1920 and the spring of 1921, that since that time there has been no real market for farm lands in the state of Minnesota, and that the value of all such lands has become largely, if not wholly, speculative.

As to the second question, while it is extremely difficult to believe that the president of a bank would, knowingly and deliberately, while engaged in trading an equity in one farm, for which the consideration was a credit of $2,000, for an equity in another, make his bank liable upon notes aggregating $36,000, the presumption arising from the deed itself is that he did so. The question then is whether Mr. Cary's testimony rebuts this presumption. His testimony, to say the least, is not very satisfactory or convincing. It seems that he did tell Roepke, Hubbard, and Vertin that the bank could not take an assignment of an undivided half interest in the contract with Mr. Williams; that he did tell them that the bank could not execute any mortgages in connection with the deal. He was inclined to think that he did not know anything about the assumption clause for several years after the deed to the bank was executed. It appears that in the fall of 1924, he received a letter from Mr. Williams, referring to the assumption of the mortgage by the bank. There is nothing to indicate that, after he found out that there was such a clause in the deed, he called it to any one's attention or attempted to do anything about it, or protested about it, and, in reply to Mr. Kerr's letter demanding payment of overdue interest, he never stated that that clause had been wrongfully inserted in the deed. Under the circumstances, while it may be entirely true that this clause was put in the deed without his knowledge and for the purpose of relieving Hubbard and Roepke of their liability and giving to Vertin a financially responsible cotenant, I do not feel that a finding to that effect would be justified. I therefore reach the conclusion that the deed must be taken as expressing the intention of the parties. I find, however, that none of the officers or directors of the bank, aside from Mr. L. F. Cary himself, ever knew that the bank had assumed these mortgages until the commencement of this action, and that the board of directors were never consulted with reference to assuming any such liability, nor were any of the stockholders consulted.

The important question, as I see it, is whether this agreement made by Mr. Cary on behalf of the bank, without any knowledge or authority of the board of directors, can be sustained as a valid obligation of the bank. There can be no doubt that the bank had the right to take in the equity of the Schmolke farm in payment of a portion of Schmolke's indebtedness. The complainant's theory is that, having taken in that equity, it was within the incidental powers of the bank and of its president acting for it, to trade the equity for the equity in another farm and to assume, as incident thereto, obligations totaling $36,000.

With respect to real estate, section 29, title 12, USCA, authorizes a national banking association to purchase, hold, and convey such real estate as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

Apparently the exact situation presented here has never been before an appellate court.

■ Generally, national banks cannot exercise any powers except those expressly granted or which are incidental to carrying on the business for which they are established. California National Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198; First National Bank v. Converse, 200 U. S. 425, 26 S. Ct. 306, 50 L. Ed. 537; Clement National Bank v. Vermont, 231 U. S. 120, 34 S. Ct. 31, 58 L. Ed. 147; Logan County National Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 35 L. Ed. 107; First National Bank v. Missouri, 263 U. S. 640, 44 S. Ct. 213, 68 L. Ed. 486.

■ A national bank may, as incidental to the power to loan money, take, as collateral, stock of another corporation, and by enforcement of its rights as pledgee become the owner of such stock and subject to stockholder's liability. California National Bank v. Kennedy, supra. However, in First National Bank v. Converse, supra, the court said, at page 439 of 200 U. S., 26 S. Ct. 306, 311:

"As no authority, express or implied, has ever been conferred by the statutes of the United States upon a national bank to engage in or promote a purely speculative business or adventure, accepting the view of the articles of association by which the bank was denied the benefit of the exemption accorded by the Constitution of Minnesota, it follows that the bank had no power to engage in such business by taking stock or otherwise. The power of a national bank to engage in the character of business which the articles of association of the thresher company manifested, as defined by the Supreme Court of Minnesota, cannot be inferred to have been possessed by the bank as an incident of securing a present loan of money, or as a means of protecting itself from loss upon a pre-existing indebtedness. To concede that a national bank has ordinarily the right to take stock in another corporation as collateral for a present loan or as a security for a pre-existing debt does not imply that, because a national bank has lent money to a corporation, it may become an organizer and take stock in a new and speculative venture; in other words, do the very thing which the previous decisions of this court have held cannot be done."

Unless the transaction here in question can be said to be incidental to the business of the bank in protecting itself from loss upon a prior existing indebtedness, it was obviously ultra vires.

■■ The purpose of the law is to keep the operations of national banks within the boundaries of what can properly be said to be the banking business. The right to take real estate in satisfaction of debts would naturally include the incidental right to purchase outstanding titles and interest in the land taken and to pay off incumbrances thereon; in other words, to do whatever was reasonably necessary to make the land marketable. Cockrill v. Abeles (C. C. A.) 86 F. 505. Such incidental right, however, is very different from the right to trade land so taken for other land and assume incumbrances thereon. In my opinion, it is the duty of the officers and directors of a national bank which has been obliged to take real estate in satisfaction of a debt to dispose of it solely for cash or the equivalent of cash, and they have no right to use it as the consideration or excuse for dealing in other lands.

■ At the time Cary entered into this deal with Roepke and Hubbard, the bank had no interest in the Williams farm whatever, and none of those who were interested in the farm owed the bank anything. The bank could not lawfully have acquired an interest in this land in exchange for any of its cash or securities. It is difficult to understand by what authority it could acquire it in exchange for any asset, even though that asset was real estate theretofore lawfully acquired. I am unable to see that the trading of an equity in one farm, lawfully acquired, for an equity in another farm which the bank has no right to acquire is any more incidental to its business than would be the outright purchase of the latter equity for cash by the bank. If a national bank, by acquiring a $2,000 equity in a farm in satisfaction of a debt, is thereby enabled, through including that as a part of the consideration, to acquire other lands, it is then permitted to do indirectly what the law forbids it to do directly. Furthermore, if full effect is given to the statement of the Supreme Court in the case of First National Bank v. Converse, supra, that a national bank may not engage in a purely speculative business or adventure even as incidental to the collection of a debt, this bank could not do what was done here. There is no pretense in this case that Roepke, Hubbard, Totten, and Vertin did anything more than to agree to buy the Williams farm in the hope of making a profit on its resale. None of them were farmers, and none had any intention of actually working the land, as their acts and conduct show. It is, of course, of no importance whether the deal was a good one or a

bad one for the bank. It was, in my judgment, a deal that it could not lawfully enter into, and it and its stockholders have the right to set up ultra vires as a defense. California National Bank v. Kennedy, supra; Merchants' Bank v. Wehrmann, 202 U. S. 295, 26 S. Ct. 613, 50 L. Ed. 1036; First National Bank v. Converse, supra; De la Vergne Co. v. German Savings Institution, 175 U. S. 40, 20 S. Ct. 20, 44 L. Ed. 65.

It follows that the decree must be that, aside from the amount which has been paid into court to take care of the complainant's default judgment entered in the state court, the complainant is not entitled to any relief in this action. A decree to that effect may be presented.