## In re KENTUCKY WAGON MFG. CO.
### No. 8132.

District Court, W. D. Kentucky.
Nov. 8, 1932.

D. A. Sachs, Jr., of Louisville, Ky., for petitioner and for Inter-Southern Life Ins. Co., James R. Duffin, William E. Massey, Robert V. Board, J. F. Murphy, and May S. Williams.

Woodward, Hamilton & Hobson, of Louisville, Ky., for Henry J. Stites, trustee.

David R. Castleman and Selligman, Selligman & Goldsmith, all of Louisville, Ky., for George D. Caldwell, successor trustee of Louisville Trust Co., Kentucky Wagon Mfg. Co., and Joseph S. Laurent, receiver of Banco Kentucky Co.

Peter, Lee, Tabb, Krieger & Heyburn, of Louisville, Ky., for A. M. Anderson, receiver of National Bank of Kentucky, of Louisville.

ANDREW M. J. COCHRAN, District Judge.

This proceeding is before me on the claim of Joseph S. Laurent, receiver of Banco Kentucky Company. The question is as to what right, if any, such receiver by virtue thereof has against the bankrupt's estate. The nature and extent of the claim should be first presented.

The bankrupt is a Delaware concern, incorporated July 8, 1924. Its business was that of manufacturing wagons, agricultural machinery, and vehicles of all kinds. So far as the manufacture of wagons, which came to it from its predecessor, was concerned, its business was a dying one. It continued in business from its incorporation until the appointment of the trustee in bankruptcy, the adjudication being had January 12, 1931. The amount of the claim in question is $2,327,649.60 principal, and $467,562.10 interest, totaling $2,795,211.70. Claimant holds as collateral security therefor the bankrupt's bond for $2,000,000, dated December 28, 1927, secured by mortgage by it to the Louisville Trust Company as trustee, dated November 1, 1927, on its plant in the city of Louisville, which mortgage the claimant and George D. Caldwell, successor to the trust company, as trustee, seek to enforce. The claim originally belonged to the National Bank of Kentucky and was sold and transferred July 23, 1930, by the bank to the Banco Kentucky Company for 100,000 shares of its capital stock, for which company claimant

was appointed receiver November 24, 1930. The bankrupt did not own the plant at first. Seemingly it then occupied same under a lease from the National Motor's Corporation to the Kentucky Wagon Company of Kentucky, a Kentucky corporation, and its predecessor, which had theretofore conveyed same to such corporation. It acquired that lease and the inventory of that company, just after its incorporation, i. e. August 8, 1924, and the plant itself through judicial proceedings from the National Motor's Corporation November 1, 1927, the date of the mortgage hereinbefore referred to. The acquisition of the lease and inventory of the Kentucky corporation was on August 8, 1924, by a bill of sale made to it by the National Bank of Kentucky, Robert V. Board, and James R. Duffin and the Kentucky Wagon Manufacturing Company of Kentucky. This bill of sale was executed by the bank through James B. Brown, its president, and Nicholas H. Dosker, attorney and agent on its behalf, by Robert V. Board and James R. Duffin by such attorney and agent, and by the Kentucky Wagon Manufacturing Company by Robert V. Board its president. Theretofore that company had gone into bankruptcy and Robert V. Board had been appointed its receiver and trustee. On July 9, 1924, Nicholas H. Dosker as attorney and agent for his principal, not stating who they were, offered $385,000 for the assets of that bankrupt of which 10 per cent., or $38,500, was to be paid in cash. This bid was accepted July 17, 1924. The bill of sale, in that it was executed by Nicholas H. Dosker, attorney and agent on behalf of the bank, Board, and Duffin, indicates that these three were the principals on behalf of whom he made his bid. Robert V. Board as receiver and trustee of the bankrupt did not join in the bill of sale. For some reason on October 24, 1924, Nicholas H. Dosker as attorney and agent executed an assignment and transfer of his bid to the bankrupt herein, the Delaware corporation. On August 8, 1924, the date of the bill of sale, the former bankrupt owed the National Bank of Kentucky on account of moneys which it had loaned such bankrupt, two notes of the National Motor's Corporation which it had discounted, for its indebtedness to others which the bankrupt had purchased for 25 cents on the dollar, two small items and interest. The moneys loaned amounted to $370,896.48, the two notes so discounted to $86,000.11, and the indebtedness purchased to $361,091. I am not sure as to whether this indebtedness represented its total amount or only the amount paid therefor. The two

small items amounted to $5,431.23. At the same time the present bankrupt, the Delaware corporation, owed the bank $800 for expense of its incorporation and $38,500 for the 10 per cent. of the purchase price which it had paid. It may be noted in passing that it does not appear how the rest of the purchase price, to wit, $346,500, was paid. At the same time the bankrupt, the Kentucky corporation, owed the following sums, to wit:

| Inter-Southern Life Insurance | |
|---|---|
| Company | $ 52,383.33 |
| Robert V. Board | 39,906.00 |
| William E. Massie | 19,066.67 |
| James R. Duffin | 75,781.67 |
| J. T. Murphy | 539.79 |
| Total | $187,677.46 |

Duffin was the president of the insurance company and it held a disputed claim of an uncertain amount against the bankrupt. These and the indebtedness to the bank were all the debts of the then bankrupt.

The consideration for this sale and transfer of August 8, 1924, to the present bankrupt, the Delaware corporation, was the execution of promissory notes by it to the bank for the then and present bankrupts' indebtedness to it amounting to $899,014.22 and to these other creditors for the amount of their debts as set forth and the issuance of 90,000 shares of its common capital stock of the par value of $10, 45,000 to the order of the bank and 45,000 to the order of Board. By the original articles of incorporation it was provided that the authorized capital stock was 50,000 shares of preferred stock of the par value of $100 per share, amounting in the aggregate to $5,000,000, and 50,000 shares of common stock without nominal or par value. By amended articles of incorporation adopted July 25, 1924, it was provided that the preferred stock should consist of 500,000 shares of the par value of $10 per share, amounting in the aggregate to $5,000,000, and the common stock of 500,000 shares of the par value of $10 amounting in the aggregate to $5,000,000.

The notes and stock called for by the bill of sale were never executed and issued. In view of the fact that Robert V. Board and James R. Duffin are designated along with the National Bank of Kentucky as the principals on whose behalf Dosker made his bid and executed the bill of sale, there may be some uncertainty as to just who was the purchaser of the personal assets of the bankrupt, the Kentucky corporation. All the witnesses agreed in their testimony that the National

Bank of Kentucky was the sole purchaser and that such was the understanding at the time. It is to be noted that the bank through its president, Brown, executed the bill of sale and that neither Board nor Duffin executed it in person. The bank paid the expense of the incorporation of the assignee and transferee, the Delaware corporation, and the $38,500 cash payment on the purchase price of those assets. It is not likely that Board and Duffin would bind themselves to pay any portion of the balance of the purchase price, to wit, $346,500, except possibly in the way of the indebtedness to them. That they were to do so in this way is negatived by the fact that it was provided that the Delaware corporation was to pay their debts. It was not expected that they would make advances to that corporation to enable it to transact business. Such advances were essential to enable it to do so. The bank alone could be looked to for this purpose. Their connection with the transaction in this way must, for some unknown reason, have been purely formal. Their sole individual connection therewith was in taking pot luck with the bank in the outcome of the venture, without assuming any of its burdens. Such being the case, Board had no personal interest in the 45,000 shares of stock of the par value of $10 per share of $450,000 in all which were to be issued to his order. He gave nothing for them. He was the president of the bankrupt and it must have been intended that they should be used by him in advancing its interests. It is not unlikely that the consideration which the bankrupt received, to wit, the assets of the Kentucky corporation, came far short of being equal to what it was to pay therefor, so that in reality it received nothing for the stock which it was to issue. There is an intimation in the evidence that prior to the change from the Kentucky to the Delaware corporation there was an understanding between the bank and the Inter-Southern Life Insurance Company of which Duffin was president that they were to act together in an attempt to save the business carried on by the Kentucky corporation, the bank to the extent of 90 per cent. and the insurance company to the extent of 10 per cent., but nothing ever came of it. If the insurance company was interested in the purchase of its assets to the extent of 10 per cent., which may account for Duffin's connection with the transaction as purchaser and assignor of the assets of that corporation, it abandoned such interest to the bank, for it did nothing in accordance therewith. It must, therefore, be taken that the bank was in reality the sole purchaser of those assets and was entitled to the full benefits arising therefrom and from the transfer of same to the present bankrupt, the Delaware corporation. Its action in the transaction from the beginning, i. e. from the purchase of certain of the assets of the Kentucky corporation at 25 cents on the dollar to placing the Delaware corporation into position to carry on the business thus represented, was to save its debt then amounting, at least, to $370,896.48, plus $86,000.11, or a total of $456,896.59. From their embodiment in the claim asserted herein it seems that the Kentucky corporation was liable to the bank, secondarily if not primarily, on account of certain other items amounting to $243,931.95, adding interest to the foregoing sum makes a total of $700,828.54, which it had at stake in this business.

After the bankrupt had thus been started on its career, the bank continuously down to shortly before its bankruptcy advanced and loaned money to it, as follows, to wit:

Payments in 1924 and 1925 to salesmen in an effort to dispose of capital stock, $7,426.14

Loans represented by seven demand notes, the amount and dates whereof are as follows:

| | |
|---|---|
| December 31, 1928 | $ 191,000.00 |
| June 29, 1930 | 159,000.00 |
| March 24, 1930 | 45,123.00 |
| March 24, 1930 | 56,629.97 |
| March 24, 1930 | 85,438.46 |
| March 24, 1930 | 493,581.26 |
| June 30, 1930 | 183,000.00 |
| Total | $1,213,772.69 |

The claim in question, therefore, is made up of the following items, to wit:

| | |
|---|---|
| Principal of sums covered by bill of sale of August 8, 1924 | $ 862,718.82 |
| Items not included in it | 243,731.95 |
| Advances and loans to Bankrupt | 1,214,198.83 |
| Total | $2,320,649.60 |

This is $7,000 less than the total made by the claimant. The indebtedness outside of the one I gather to be about $40,000. The enforcement of the mortgage will shut out this indebtedness. The plant has been sold, and if I mistake not, brought no more than sufficient to pay these outside claims.

The main position of the trustee, who is resisting the claim of the receiver, which alone will be considered, may be taken to be, not that it is not a valid claim against the bankrupt, but that its payment should be post-

962

poned to the payment of its other indebtedness which means that nothing can be paid on it. This position is based on the relation between the National Bank of Kentucky with whom the claim originated and the bankrupt. His claim as to such relation may be put thus. It was a relation of principal and agent, the bank being the principal and the bankrupt the agent. The bankrupt held its property and carried on its business not on its own account but on account of the bank. If such was the case there can be no question but that the payment of the receiver's claim should be postponed to the payment of the other indebtedness. Where such a relation exists between two corporations the principal is the dominant corporation and the agent the subordinate. Cases involving the question whether such a relation existed between two corporations has arisen are very numerous in the books. That such relation existed has been held in the following federal decisions, to wit: Interstate Tel. Co. v. B. & O. Tel. Co. (C. C.) 51 F. 49; Glidden & Joy V. Co. v. Interstate Nat. Bank (C. C. A.) 69 F. 912; Am. Nat. Bank v. Nat. Wall Paper Co. (C. C. A.) 77 F. 85; Cockrill v. Abeles (C. C. A.) 86 F. 505; Wallerstein v. Ervin (C. C. A.) 112 F. 124, 126; Lehigh Valley R. Co. v. Dupont (C. C. A.) 128 F. 840; In re Muncie Pulp Co. (C. C. A.) 139 F. 546; In re Rieger, Kapner & Altmark (D. C.) 157 F. 609; Colonial Trust Co. v. Montella Brick Works (C. C. A.) 172 F. 310; Clere Clothing Co. v. Union T. & Savings B. Co. (C. C. A.) 224 F. 363; Chicago Mill & Lumber Co. v. Boatmen's Bank (C. C. A.) 234 F. 41; Baker Motor Vehicle Co. v. Hunter (C. C. A.) 238 F. 894, 899; New York Trust Co. v. Carpenter (C. C. A.) 250 F. 668; The Willem Van Driel Sr. (C. C. A.) 252 F. 35; Luckenbach S. S. Co. v. W. R. Grace & Co. (C. C. A.) 267 F. 676; Portsmouth, etc., Corp. v. Fourth Nat. Bank (D. C.) 280 F. 879; Fourth Nat. Bank v. Portsmouth, etc., Corp. (C. C. A.) 284 F. 718; Wabash Ry. Co. v. Am. Ref. T. Co. (C. C. A.) 7 F.(2d) 335; In re Marcella Cotton Mills (D. C.) 8 F. (2d) 522; Bishop v. United States (C. C. A.) 16 F.(2d) 410; Costan v. Manilla Electric Co. (C. C. A.) 24 F.(2d) 383; Industrial R. Corp. v. General Motors Corp. (D. C.) 29 F.(2d) 623; Kimberly Coal Co. v. Douglas (C. C. A.) 45 F.(2d) 25; N. Y. T. Co. v. Island Oil & T. Corp. (C. C. A.) 56 F.(2d) 581; Central R. Bank & T. Co. v. Caldwell (C. C. A.) 58 F.(2d) 721; United States v. Lehigh Valley R. Co., 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Delaware, L. & W. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438; C., M. & S. P. Ry. Co. v. Minneapolis C. & C. Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; United States v. Reading Co., 253 U. S. 26, 40 S. Ct. 425, 434, 64 L. Ed. 760.

In such cases the dominant corporation is often termed the parent and the subordinate its subsidiary. The latter is referred to as an instrumentality of the former or as an adjunct to it. Sometimes it is said that the dominant corporation owns the subordinate corporation or that the two corporations are one or that they are practically identical. Further it is not infrequently said that the court should look through or beyond the fiction of the corporate entity of the subordinate corporation as an unreality or that its distinct corporate existence or its legal entity should be disregarded. It is characterized as a "Dummy." In the case of Kimberly Coal Co. v. Douglas (C. C. A.) 45 F.(2d) 25, 27, the matter was thus put: "The independent entity of the two companies is so far disregarded that each is considered a part of the indivisible whole." It seems to me that none of these ways of putting the matter is strictly accurate. I do not see how one corporation can own another corporation. Each is a distinct person, in the eye of the law, and one person cannot own another person. Nor can two corporations be one corporation any more than two natural persons can be one natural person, nor can two corporations be merged into one corporation any more than two natural persons be merged into one natural person. There can be no identity between two corporations any more than between two natural persons. Of course, two corporations can be merged or consolidated into one corporation by statutory authority, but not otherwise can two corporations become one corporation. Nor should the distinct corporate existence or legal entity of the subordinate corporation be treated as an unreality or disregarded. As I see it, there is no indivisible whole in such a case. Of course, where such a relation exists the case may be disposed of as if the subordinate corporation had no existence and its property and business were held and carried on by the dominant corporation. But in so disposing of it the subordinate corporation is not regarded as having no distinct corporate existence or as not being a legal entity. It does have such existence and is such an entity. As said in the case of United States v. Reading Co., supra, the court deals with the case as if the corporate agency did not exist. It is the same as in the case of a relation of principal and agent between two natural persons. The

existence of the agent may be ignored and the case disposed of as if the property and business owned and carried on by the agent were the property and business of the principal. But there is no necessity and it is not helpful to so dispose of the case. The distinct and independent corporation existence of the subordinate corporation as well as of the dominant corporation should be fully recognized. Such recognition does not prevent the relation of principal and agent existing between them. There is no reason why one corporation may not be the agent of another. Possibly there may be some question as to whether a corporation authorized to do a certain business may do that business on account of another, but this does not render it so that one corporation may not, in fact, be the agent of another corporation.

We come then to the question as to whether the relation of principal and agent did in fact exist between the bank and the bankrupt. What is the test of the existence thereof? It is not that the one corporation brought about the incorporation of the other —that the one owns all the capital stock of the other and that the directors of the two corporations are the same. All of these things may exist and yet such relation not exist. In the case of United States v. Reading Company, supra, it was said that "the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interests between the two" and that it does not create such identity where the ownership thereof is "for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders." This principle was applied in the following cases, to wit: Fitzgerald v. Mo. Pac. Ry. Co. (C. C.) 45 F. 812; Central Trust Co. of New York v. Bridges (C. C. A.) 57 F. 753; Richmond & I. Const. Co. v. R. N., I. & B. R. Co. (C. C. A.) 68 F. 105, 108, 34 L. R. A. 625; Watson v. Bonfils (C. C. A.) 116 F. 157; C. Crane & Co. v. Fry (C. C. A.) 126 F. 278; In re Watertown Paper Company (C. C. A.) 169 F. 252, 255; Pittsburgh & B. Co. v. Duncan (C. C. A.) 232 F. 584; Peckett v. Wood (C. C. A.) 234 F. 833, 838; Majestic Co. v. Orpheum Circuit (C. C. A.) 21 F.(2d) 720; Am. Cyanamid Co. v. Wilson & T. F. Co. (C. C. A.) 51 F.(2d) 665.

In the case of Richmond & I. Const. Co. v. R. N., I. & B. R. Co., it was said: "The contract company was a legal corporation, wholly distinct and separate from the railroad company. The fact that the stockholders in each may have been the same persons does not operate to destroy the legal identity of either corporation. Neither does the fact that the one corporation exercised a controlling influence over the other through the ownership of its stock nor through the identity of stockholders, operate to make either the agent of the other, or to merge the two corporations."

The test, as I conceive it, is whether the one corporation controls the action of the other. Is the latter subordinate to the former, and does the former dominate the latter? The corporation, which is the principal, is frequently termed the controlling corporation. The fact that it may have brought about the existence of the other corporation, that it owns all its capital stock, and that the directors of both corporations are the same or substantially so, though they do not of themselves bring about the relation of principal and agent between the two, help other circumstances to establish the existence thereof. The facts of a case may make it difficult to determine whether such control and consequent relation exist. It is to be noted that it is not "controlling influence" that is essential. It is actual control of the action of the subordinate corporation.

The claimant urges another test as to whether such relation exists between two corporations. It is whether the one corporation is liable for all the debts of the other. If it is not then such relation does not exist. If it is the relation exists. Possibly he means no more than that such is the test not of whether the relation exists, but, assuming it to exist, of whether the principal's debt should be postponed to the other debts. But it is not clear that he so means and it is immaterial which way it is to be regarded. In his preliminary index to his brief, he says: "The claim may not be rejected unless the Bank was liable for all the debts of the Wagon Company." In the body thereof he says: "The only principle which would justify the negation of the Bank's claim is one which would at the same time permit all the other creditors of the Wagon Company to collect their debts from the Bank." And again: "There is no legal ground upon which to reject our claim unless upon the same facts the Bank is responsible for all the debts of the Wagon Company." He terms this a "basic legal principle" and says that it "has controlled the application or rejection of the 'alter ego' doctrine in different circumstances."

This point he says "ends the case of the opposition." It does so because the action of the bank in carrying on the business through the bankrupt was, as he claims, ultra vires and hence it was and is not liable for the debts incurred by it. There can be no question that, assuming that the bank did carry on the business of the bankrupt, its action was ultra vires, even though it was actuated in so doing by a desire to save its debt. Cockrill v. Abeles, supra; Cooper v. Hill (C. C. A.) 94 F. 582; First Nat. Bank v. Converse, 200 U. S. 425, 26 S. Ct. 306, 50 L. Ed. 537; Merchants' Nat. Bank v. Wehrmann, 202 U. S. 295, 26 S. Ct. 613, 50 L. Ed. 1036. It may be that to save its then indebtedness it had power to purchase claims against the Kentucky corporation at 25 cents on the dollar, to purchase its assets for $385,000 and pay 10 per cent. thereof to acquire them, to cause the bankrupt to be incorporated and pay the expenses necessary to start it on its business career and to employ salesmen to dispose of its property and business, which it caused to be done at once upon its being so started but it had no power as it did to carry on that business indefinitely until it could find some suckers on which to unload the concern. Looking back one can not but regard its action as a most reckless performance. But it does not follow from the fact that its action in so doing was ultra vires that it was and is not liable for the other debts of the bankrupt. A contract of a corporation may be ultra vires and yet if it receives the fruits or benefits of the contract it can not escape liability. This principle has been applied in the case of national banks. American Nat. Bank v. Nat. Wallpaper Co. (C. C. A.) 77 F. 85; Portsmouth, etc., Corp. v. Fourth Nat. Bank, supra; Fourth Nat. Bank v. Portsmouth, etc., Corp., supra; Citizens' Central Nat. Bank v. Appleton, 216 U. S. 196, 30 S. Ct. 364, 54 L. Ed. 443; Rankin v. Emigh, 218 U. S. 27, 30 S. Ct. 672, 54 L. Ed. 915. In view of this principle it is possible that the bank was and is liable for all outstanding indebtedness of the bankrupt other than to its assignee or to it. The nature and basis of such indebtedness does not appear in the record so far as I am able to make out. In the absence of evidence in regard thereto it cannot be said that there is not such liability on the part of the bank. For this reason if for none other, the claimant's contention falls to the ground. But it is immaterial whether this is so or not. His contention is not sound. He supports it by quotations from the opinions in certain cases. In the case of In re Watertown Paper Company, supra, where it held that the relation of principal and agent did not exist between the creditor corporation and the bankrupt corporation, it was said: "Any legal principle which would prevent the pulp company [the creditor corporation] from collecting its claim from the estate of the paper company [the bankrupt corporation] would permit all the creditors of the paper company to look to the pulp company for payment of their demands—would, in effect, extend the jurisdiction of the bankruptcy court over the pulp company."

In the case of Peckett v. Wood, supra, where also such relationship was held not to exist it was said: "The only principle, I think, upon which these otherwise valid claims may be postponed in payment to those of other creditors is one which would at the same time permit the other creditors of the corporation to collect their claims from R. D. Wood & Co."

Claimant states that in the case of Baker Motor Vehicle Co. v. Hunter, supra, where such relation was held to exist it was so held because the principal was liable for the debts of the agent. He quotes: "In such cases the controlling corporation may be held liable for the debts of the subordinate company. This court called attention to this principle in Re Watertown Paper Co., 169 F. 252, 94 C. C. A. 528 (1909). In such cases debts due from the subordinate company to the controlling corporation, and which that corporation would accordingly be liable for, are not entitled to be paid pari passu with the other debts; but the latter are entitled to be first paid in full."

Undoubtedly where the relation of principal and agent exists between two corporations not only should the debts due the principal from the agent be postponed to the debts of other creditors of the agent, but the principal is liable for such debts. Both these positions follow from the same considerations, to wit, the existence of such relation between the two. The principal is always liable for the debts incurred by his agent. Likewise the principal cannot participate in the distribution of the agent's assets as to the indebtedness of the agent to him on an equality basis with the agent's indebtedness to others. But it is not true that unless the principal is liable to others for the debts of others he has a right to participate on an equality with such others or putting it otherwise it is only where he is so liable that he has such right. The cases cited or the statements in the

opinions therein relied on do not support such position.

In the cases of In re Watertown Paper Co. and Peckett v. Wood, it was held that the relation of principal and agent did not exist. Hence no question was involved in either as to the relative rights of a principal and other creditors against the agent. In the statements relied on it was said that if the principal is to be postponed as to the other creditors, it would be liable for their debts. It was not said that if it was not liable to them therefor its debt should not be so postponed. The statements that if its debt is to be postponed to the debts of others, it was liable for their debts, assumed that the principal had power to incur such indebtedness. A case where it had no such power was not in contemplation. On such assumption the statements were sound beyond question. The ground upon which the indebtedness of the principal should be so postponed is the existence between it and the agent of such relation. On the same ground it followed that the principal is liable for the agent's debts to others, if it had power to incur such indebtedness. It could not be otherwise.

The case of Baker Motor Vehicle Co. v. Hunter, supra, was one where the relation of principal and agent was held to exist. The principal was engaged in the manufacture and sale of electric motor vehicles in Ohio. The agent was engaged in the business of selling such vehicles for it in New York City. That was the business which the principal was authorized to do and of course it was liable for any indebtedness incurred by the agent. There was, therefore, no question in the case as to what would have been the rights of the parties if it had no power to incur such indebtedness. Nothing that was said in the opinion has any bearing whatever on a case involving such contingency.

Then considering the matter on principle is there anything in the circumstance that the principal is not liable for the debts of the agent, for want of power, to incur such indebtedness, to require that the indebtedness of the agent to the principal should not be postponed to the indebtedness due by the agent to others than the principal? This depends on the reason why the indebtedness of the agent to the principal should be so postponed where he is liable for such other indebtedness. A superficial reason therefor is that if it is not so postponed but allowed to participate along with the other creditors in the distribution of the agent's assets it will be bound to make up to the other cred-

itors any unpaid balance of their debts after applying their shares of the assets thereto. The other creditors should not be put to this roundabout way of collecting their debts. A short cut to the payment thereof is to deny them any participation in the distribution of the agent's assets until they are paid to the extent thereof. Of course, if those assets are not sufficient, without such participation, to pay their debts in full then they will have to resort to the principal to recover the balance left unpaid. It does not follow from this that they should not receive payment to the full extent of such assets without such participation. Of course, the reason under consideration falls to the ground if the principal is not liable for such other indebtedness for want of power to incur it. But this reason is not the fundamental reason why the principal should be postponed to the other creditors. Though the principal may not be liable to them for their debts for want of power to incur them the agent is liable to them therefor. The relation of creditor and debtor exists between them and the agent, just the same as if in incurring the debts he was acting for himself and not for the principal. No such relation exists between the principal and agent except indirectly. The liability of the agent to the principal is on the ground of his accountability to the principal for advances made by it to him. It is only upon the settlement of their accounts that it can be said that the agent becomes indebted to the principal. Such being the case, the principal should not be allowed to share in the distribution of the agent's assets to the extent of such liability along with the creditors of the agent whose debts have been incurred by the agent for and on behalf of and at the instance of the principal. This should be, no more than if the principal was carrying on the business for itself and not through an agent, it should be allowed to share with its creditors as to what it has put in the business. The liability of the agent to the principal in so far as creditors of the agent are concerned is really a liability of the principal itself.

A direct authority against the claimant's position is the decision in the case of Wallerstein v. Ervin, supra, where it was held that where a corporation entered into partnership articles with individuals and contributed to the capital of the firm and shared in its management to the extent of such acts it executed the contract of partnership and became a partner de facto and that it could not ignore the status thus created and by asserting that the partnership agreement was ultra vires,

prove a claim against the firm in bankruptcy in competition with general creditors for advances made or goods sold to the partnership. The court said: "The trustee did not seek to enforce an ultra vires contract, nor to compel the performance of any of its provisions. He simply insisted that a status which had been created by what had actually occurred should not, at the instance of a party to its creation, and to the prejudice of innocent third parties, be utterly ignored, and we think that in sustaining this insistence the court below was clearly right."

Thus far I have considered claimant's test as bearing on the question as to whether the principal should be postponed to the other creditors in the distribution of the agent's assets. He puts it forward also as a test whether the relation of principal and agent exists between the two corporations. It cannot have any possible bearing on such question. That the bank could not have engaged in the business carried on by the bankrupt and hence was and is not liable for its debts otherwise than as above indicated has nothing to do with the question as to whether the relation of principal and agent existed between them. That depends solely on the question as to how the business was carried on. That a corporation had no power to do a certain thing does not determine whether it in fact did such thing. It may in fact have done such thing though it had no power to do it.

I come now to the question as to whether the relation of principal and agent existed between the bank and the bankrupt. It seems to me that it is clear that it did. The bankrupt carried on its business, not on its own account, but on account of the bank. The bank was dominant and controlling in the operation of its business. The bankrupt did not act independently of the bank but in subordination thereto. The bank brought about the incorporation of the bankrupt and paid the expense of it. The incorporation and organization of the bankrupt was regular under the laws of Delaware. Three Delaware citizens were the incorporators. In the articles of incorporation they subscribed for $1,000 of no par capital stock provided for therein; $800 of this was paid by them with money furnished by the bank. They met July 26, 1924, and chose five directors living in Louisville, the number provided for in the by-laws. Neither director owned any stock in the bankrupt. This was not required. Only one of these five directors had any official connection with the bank. He was a vice president thereof. Two were to have charge, of the operations of the bankrupt, one of whom, Robert V. Board, became president, and the other became second vice president and two of whom were stockholders in the Continental Car Company, a contract for the purchase of its stock being one of the first things done by the bankrupt after its organization. On the same day, the subscribers executed and delivered an assignment in blank of their shares of stock. This blank was never filled and certificates therefor were never issued. It must be taken that the bank by virtue thereof became the owner of this stock. The directors so chosen were, therefore, named by the bank. All that was thus done was normal and usual and the result thereof was that the bankrupt became ready for business. But it had no right to transact business in this state until it complied with section 543, Kentucky Statutes, because of section 202 of the Constitution of Kentucky. This statute required that 50 per cent. of its capital stock be subscribed for in good faith as a condition of its right to so do. This requirement was not then or afterwards in the course of its business career complied with. It would have been complied with without a formal subscription if such proportion of its stock had been bought and paid for. The only stock which it can be claimed was bought and paid for was the 90,000 shares provided for in the contract of August 8, 1924, hereinbefore referred to and the stock that was to be, given for stock of the Continental Car Company under the contract entered into on behalf of the bankrupt August 1, 1924, by Board as president, before he had been chosen for that office. The stock in that company though in the names of four individuals two of whom were the president and one of the vice presidents of the bank and two of whom were elected directors of the bankrupt as hereinbefore stated, was likely all held for the benefit of the bank. This contract seems to have fallen through by the destruction of the plant of that company, the collection of the insurance thereon, and its application on its debts. It is likely that its stock was without any market value so that the sale by the bankrupt of its stock was invalid under section 193 of the Constitution of Kentucky. As to the 90,000 shares of stock called for by the contract of August 8, 1924, it is likely that no real consideration was given therefor. No certificate was ever issued for any of this stock. Notwithstanding this incapacity to do business in Kentucky, the bankrupt did transact business therein from its organization until its bankruptcy and the business which it did, it is

likely, was very large. After the first election of directors there was never any subsequent election thereof. The by-laws called for meetings of the stockholders on the fourth Tuesday in May each year for that purpose. No such meetings were ever held. The directorate, however, did not remain the same during all the time. Two of them, those who came over from the Continental Car Company, ceased to act as directors, first one and then the other, and three others began and continued to act as such to the end. This made six directors, one more than the by-laws authorized. The records of the bankrupt do not show how the former got out or the latter got in. Apparently the two slid out and the three slid in. Two of the latter were directors of the bank, one of whom was its first vice president, and the other was thought to have special capacity for the business the bankrupt was engaged in. It was at the instance and by the direction of the bank that these three assumed the position of directors of the bankrupt. Thus it is seen that the proceedings above set forth after the Delaware organization were abnormal and unusual. They could hardly have been more so. It cannot be accounted for on any other basis than that regularity was a matter of indifference, as the property and business of the bankrupt was regarded as the property and business of the bank.

It was at the instance and by the direction of the bank that the bankrupt made the purchase of August 8, 1924; that it entered into the contract of August 1, 1924, with the stockholders of the Continental Car Company. So it was that on August 9, 1924, the bankrupt entered into a contract with two Delaware corporations and again in December, 1924, with one Johnson for the sale of the stock of the bankrupt. It advanced on account of those transactions the sum of $7,426.14. Again in 1928 it sent Board and Duffin to Europe for the same purpose, where they remained for five or six months. It advanced the expenses of this jaunt, amounting possibly to as much as $20,000. During the whole of its business career the policies of the bankrupt were determined by the bank. The directors regarded that in so acting as such they were representing the bank. It and not the directors determined who should be the officers and fixed their salaries of its officers.

The bankrupt deposited all the moneys which it received with the bank, and the bank furnished it all the money which it needed to carry on the business over and above what it received from the sale of its products. It so furnished over $1,200,000. The bankrupt never borrowed any money from the bank in the ordinary way. It merely overdrew its account with the bank to meet its needs. It supplied the bank with blank notes to fill in and take up the overdrafts from time to time, possibly at times consolidating these notes into notes for larger amounts. It purchased its trade acceptances given for purchases made by it from the holders thereof and from the bankrupt notes given to it by persons who had purchased from it. This it did in a great number of instances. After July 23, 1930, when it sold and transferred the indebtedness then due it from the bankrupt to the Banco Kentucky Company until its failure on November 17, 1930, the bank continued to meet overdrafts by the bankrupt and to purchase such acceptances and notes. When the bank failed the overdraft amounted to $70,815.85. During that time it purchased 131 acceptances held by 17 different concerns amounting in all to $30,042.82 and 83 notes owing by 48 concerns amounting to $65,928.-10. These acceptances and notes were all held by the bank at the time of its failure.

It was the understanding both of the bankrupt and the bank that the property and business of the former was the latter's and that it would see that the former's debts were paid. The bankrupt so represented to its would be creditors. Whilst the bank did not so represent it, again and again in response to telegrams and letters as to the ability of the bankrupt to meet its debts, it stated that it was able and that it was in good financial standing. It had a standard letter to this effect. In view of the actual conditions, which the bank knew, these statements could not have been made except on the idea that it would see that its debts were paid. And, as putting the matter beyond question, at the time the bank failed, it and its assignee Banco Kentucky Company held that the entire indebtedness of the bank except to the extent of the measly sum of about $40,000. Mr. Brown, the president of the bank, a witness for claimant, testified on cross-examination as follows:

"Q. At the time (i. e., when letters were sent out representing that the Bankrupt was good financially and able to pay its debts) you in good faith, believed that every debt of the Wagon Company would be paid? A. Yes, sir.

"Q. And while you never made or authorized anybody else to make any representations that the bank would pay the debts, you, in

good faith, did expect that the bank would see that they were paid, that is the truth of it, isn't it? A. That is true and did pay them."

Again he so testified:

"Q. The bank owned the Wagon Company absolutely and entirely since the incorporation of the Delaware corporation, isn't that true? A. Absolutely, just like the court owns this seat.

"Q. And you operate it just the same as this court is operating it, that you couldn't let loose of it? A. Yes, sir."

Mr. Jones, first vice president of the bank, also a witness for the claimant, testified that he "always figured that the bank owned the Wagon Company" and that he so figured it "for the reason that we put up all the money that was used when we bought the personal property of the Wagon Company and later on when we bought the buildings, land and machinery, we put up all the money advanced at that time, so if the National Bank of Kentucky didn't own the Wagon Company I don't know who could own it."

He testified further that so far as he knew the wagon company "was owned absolutely and entirely by the bank."

Such then are the facts which go to make out that the relation between the bank and the bankrupt was that of principal and agent. As against this position the claimant urges that the directors of the bankrupt met frequently and directed its affairs and that the accounts of the bankrupt were kept by it and not by the bank. Such indeed were the facts. Its directors seem to have been quite attentive to its affairs. There were two minute books of their meetings. The last one is missing. The first one covers from the start to August 3, 1926. After the meeting of August 7, 1924 hereinbefore referred to, there was no meeting until March 10, 1925. This would seem to be explained by the fact that the bankrupt and the bank were engaged during this time in a strenuous effort to dispose of the bankrupt's property and business. From March 10, 1925, to August 3, 1926, there were 46 meetings, 28 in 1925, and 18 in 1926. The circumstance that the principal kept the accounts of the agent has been referred to in some of the cases where the relation of principal and agent was held to exist as evidence of that fact. But that here the bank did not keep the books of the bankrupt, they being kept by it and that the directors were active in looking after the affairs of the bankrupt is not against the relation between the bankrupt and the bank being that of principal and agent. In view of such relation between them one would not expect these matters to have been otherwise.

The making of the mortgage on November 1, 1927, to secure the $2,000,000 bond is not against the existence of such relation. It is likely that its making was brought about to put the indebtedness in a better shape to pass the national bank examiners. It was contemplated that that amount should be issued in bonds secured by the mortgage and sold to the public and the bond of $2,000,000 given to the bank was only a temporary arrangement until such bond issue could be floated.

There is no escaping the conclusion that the relation of principal and agent did exist between the bank and the bankrupt and that, therefore, the payment of the indebtedness to the claimant as well as to the bank should be postponed until the other creditors are paid which will leave nothing for them.

A decree can be entered in accordance herewith.