## In re CHAS. K. HORTON, Inc.

### No. 1840.

District Court, S. D. Texas, Houston Division.

March 24, 1938.

Baker, Botts, Andrews & Wharton and J. C. Hutcheson, III, all of Houston, Tex., for trustee.

Sewall Myer, of Houston, Tex., for Chas. K. Horton.

## ATWELL, District Judge.

Chas. K. Horton filed four claims in this bankruptcy proceeding. Claim No. 21 is for $4,500 for alleged services as president and manager from December 8, 1933, to June 6, 1935. $600 of this amount comes within the three-month period and is, therefore, sought to be fixed as a secured claim. Claim No. 35 is in the amount of $41,900 and is a note, dated February 29, 1932, payable on demand, signed by Horton as president and Powell as acting secretary of the corporation. The bankruptcy proceedings were filed on June 6, 1935.

Claim No. 36 is in the sum of $1,816.58, based on various amounts alleged to have been advanced to the corporation by Horton.

Claim No. 37 is in the aggregate sum of $2,520.10, and seems to be made up of the assignment of certain judgments and notes owed by the corporation to various other corporations which were assigned to Horton. There seems also to be a claim by the Texas Concrete Pipe Company.

Before the referee, 246 pages of testimony were taken, during which hearing Powell, Martel, Phillips, Mrs. Glenn Horton, and Meece testified. There were also some letters introduced which seem to have been written by Horton.

The capital stock of the corporation was $200,000, divided into 2,000 shares. Approximately $186,000 of this was paid in by property which Horton owned previous to the incorporation. Approximately $14,000 in cash was to have been paid in, but the records do not disclose that it was actually paid. 1,998 shares of the stock were placed in the name of Horton, 1 share in the name of Mrs. Glenn Horton, the wife of Horton, and 1 share in the name of Meece, which was later transferred to Powell. None of the stock was actually issued. It remained in the stock book, and when Meece went out, Horton took the stock book out to him and had him transfer that share to Powell. Both Powell and Meece were employees of Horton.

Mrs. Horton and Meece and Powell had been active in Horton's business prior to the incorporation. Meece and Powell as employees and Mrs. Horton doubtless because of her deep interest in the affairs of her husband.

Mr. Horton was engaged in the contracting business and in other businesses, and the corporation came into being because of Horton's desire to borrow money from the Guardian Trust Company and the disinclination of that bank to lend upon the security Horton offered because of possible homestead complications, and it was then determined to place the property in the name of the corporation, and the organization was effected in order that that might be accomplished.

Prior to the incorporation, Horton had made certain municipal contracts which he transferred to the corporation, and it was out of those contracts that the $41,900 note subsequently arose because the contracts resulted in that loss.

Powell's connection with Horton commenced in 1925 as a bookkeeper. At that time Horton was a general contractor and had been in that business before Powell became an employee. At that time Horton's business was extensive. The corporation carried on the same sort of business that Horton had been carrying on and took over all of the physical assets that he had employed in that business. Powell paid Meece $1 for the stock that Meece transferred to him in the manner I have just indicated.

Most of the stockholders' meetings were informal. No minutes were made of them. Just meetings between the three stockholders to discuss different questions. No meeting was ever held to authorize Mr. Horton to enter into a contract. When he thought a contract was good, he would just go ahead and bid on it as he had done before the incorporation. Occasions would arise

when Powell and Mrs. Horton voted against Mr. Horton's position. Sometimes Horton would follow Powell and Mrs. Horton in conclusions, and sometimes he overruled them. No dividends were ever declared by the corporation.

There was an account on the books for Chas. K. Horton. It was an active account and considerable sums of money passed to charge and credit in that account. One of the first large items is the beginning of the claim which now amounts to $41,900, and is evidenced by the demand note. During the first three months after the incorporation, this account with Horton was very active, and there was an indebtedness charged to him on the books of the company of $82,490, and a little later on a debit in the amount of $237,156 and a credit of $273,194. A summary by the witness shows a few days after that a total debited to Horton of $370,093 and a total credit of $366,711.

The activity of this particular account continued through all of the years and in truth the private expenses of Horton were paid by the corporation. The jobs in which Horton engaged were numbered and sums of money that arose out of a job and passed into the corporation would be charged as a debit or a credit as the facts might warrant.

Martel was an accountant, and he set up the original books of the corporation. Later when he was called upon to make an income tax return for Horton and probably for the corporation, he discovered that the books were not up and not in balance. The witness also testified to the fact that the $13,900 which was to have been paid in cash for the stock was not paid. The entry shows that the one share of stock made out to Meece in the stock book was paid. While the books show the collection of the $13,900 in cash, there is an offsetting credit to the cash as charged to Horton personally.

Trustee Phillips testified that his conversation with Powell confirmed Powell's statement that the corporation was organized for the purpose of enabling Horton to secure a loan on his, Horton's, office, garage, and warehouses which the trust company feared might be homestead, and that there was practically no change in the method of operating the business after the incorporation. It was carried on in substantially the same manner as it had been prior to the incorporation, and that there were only informal directors' meetings, and that there were very few of those.

Meece testified that he had been with Horton for several years before the corporation was formed; that he was largely engaged in superintending the jobs themselves and did some buying and looked after the employees; that he was one of the incorporators of the company and received 1 share of stock and offered to pay for it, and he was told that they would take care of that; that he did not pay for it, and that it was "just held in my name"; that when he left, he transferred his stock to Powell; after the incorporation, his duties were about like they had been before the incorporation; that he and Mrs. Horton were the principal assistants before the incorporation, with Powell as bookkeeper, and after the incorporation there was not much change in the method of conducting the business; that there were two or three meetings during the year, and that at other times they would just get together and consult at the office; that he and Mrs. Horton continued to advise and assist Mr. Horton in the running of the business; that they did not always agree with Horton, and sometimes when he was off, "I did things I knew he wouldn't have done"; that there were times in the meetings when they opposed Horton, and that he, Horton, would acquiesce and he usually listened to what they had to say. He left the corporation in 1931, and his stock was transferred in 1932, several months after he left. Mr. Horton came to his station and got the stock for Powell or later got "me to sign the transfer," but he was unable to say that Powell paid him anything for the stock. At the time of the incorporation, the witness said that there were a great many contracts which Mr. Horton had taken before the incorporation, and he finished them though they were assigned to the corporation.

The record also shows that the corporation went into a state court receivership, out of which it emerged with the consent of all creditors as evidenced by signed agreement which gave twelve months' moratorium, but to this agreement Horton was not a party, though, according to the claims presented here by him, he was at that time the largest creditor.

The findings of the referee seem to be well supported by the record. Those findings may be epitomized by the statement that the corporation was really Mr. Hor-

908

ton's alter ego. It was functioning for him and his benefit and the carrying on of his business.

As suggested by counsel for Mr. Horton, corporations usually are hoped to be for the benefit of the shareholders, but that is not the sort of functioning that the bankrupt corporation engaged in. It was engaged in carrying on Horton's business. It was in truth an adjunct or instrumentality for doing that.

It must be conceded that a corporation entity will not be ignored because one individual owns all of the stock. Courts exercise great caution in ignoring the artificial entity, and such ignoring only comes if and when the proof substantiates the thought, and drives any other conclusion from the mind, that the entity is in fact the tool or mere agency of the owner of the stock. Centmont Corp. v. Marsch, 1 Cir., 68 F.2d 460; In re Kentucky Wagon, D.C., 3 F.Supp. 958; Id., 6 Cir., 71 F.2d 802; Needham v. Bickford, 1 Cir., 83 F.2d 756; Woodbury v. Pickering Lbr. Co., D. C., 10 F.Supp. 761.

Giving every reasonable presumption to this corporate body which was formed by Mr. Horton, it is impossible to find any basis for ignoring the determination of the referee.

An order may be drawn, postponing, but not disallowing, the claims filed by Mr. Horton, and affirming the action of the referee.